## United States District Court
### District of Connecticut

**Erin Quinn and Robert Marra**,
*Plaintiffs,*

No. 25-cv-1548

*v.*

September 16, 2025

**Garrett Eucalitto** and **Ronnell Higgins,**
*Defendants.*

## Motion for Preliminary Injunction

Erin Quinn and Robert "Bob" Marra are part of loosely affiliated groups of Connecticut residents committed to expressing dissent with current federal government policies and actions by peacefully displaying signs on various highway overpasses across the state. The signs contain a variety of messages, including: "Due process is the law," "These voices melt ICE," "No kings," "Love Liberty? Resist Tyranny," and "Hands Off Our Judges." The sign-holders, many of them older people who are retired from full-time employment, informally communicate with each other to plan when and where to hold their signs. They then drive to a nearby location at the appointed time, park in legal parking spots, and walk onto the overpasses, where they typically stand with 3-6 other people and hold their signs while waving. Because some sign-holders get tired standing for long periods of time, they sometimes bring lawn chairs and rest intermittently. After a few hours, they pack up their signs and chairs and go home.

Informal groups of sign-holders have been peacefully holding signs on Connecticut overpasses since the November 2024 election, but most, like Ms. Quinn and Mr. Marra, began in earnest after January's presidential inauguration. For several weeks, they ran into no issues, and were able to peacefully come, hold signs and wave for several hours, and leave without incident.

Starting in February 2025, however, state police employees began detaining sign-holders standing on overpass sidewalks. They offered a variety of rationales. One was that affixing signs to overpass fences is against Department of Transportation regulations (true). More often, however, the sign-holders were told that merely displaying signs on overpasses is against those regulations (untrue). Some troopers declared that the sign-holding violated unspecified criminal statutes because it could potentially be distracting, or even that setting foot on an overpass constitutes criminal trespass onto state property. Both the numbers of detentions and the rationales for them quickly escalated. Police intervention became more and more frequent, to the point that some sign-holders—not Ms. Quinn or Mr. Marra—were issued citations, or in one case, even arrested. Although committed to the cause and confident that their actions comport with the First Amendment and Connecticut law, Ms. Quinn and Mr. Marra are now too afraid to continue their protests. They now turn to this Court for an injunction vindicating their right to speak.

1.     **Facts**

1.1.   **The plaintiffs join sign-holding protests on Connecticut overpasses.**

Early this year, plaintiff Erin Quinn became alarmed by what she views as the federal government's newfound contempt for the rule of law. She began thinking about how to voice her concern to her community, eventually meeting a group of people who informally came together to peacefully hold signs on interstate overpasses to the passing traffic. The group called itself the Visibility Brigade. Their signs, containing

different messages, were either homemade letters on black Posterboard, used to spell out messages, or vinyl banners. Ms. Quinn decided to join them.

From March 2025 to July 2025, Ms. Quinn joined about 20 protests, mainly in West Haven, organizing her schedule around her kids' school drop-off and pick-up. She has held posterboards, and also helped hold poles attached to larger banners. For Ms. Quinn, standing with the group's signs and personally holding them up is a key part of trying to get her message across to people in the area.  In her view, showing her face with the signs demonstrates to people living in her part of Southern Connecticut that "regular people who live right here" care about the rule of law.  She believes that signs alone fail to convey her important message on a human level: "A poster or billboard could be paid for by who knows what organization, but when I'm holding my signs, you can see that it's a real human behind it."

Plaintiff Robert "Bob" Marra is a seventy year-old tree pathologist who works as a research scientist. Mr. Marra has become similarly alarmed by the behavior of the current executive branch, and hoped to do something tangible to show his disagreement with the direction of the country. In late January or early February, Mr. Marra learned of the Visibility Brigade, and decided to join them.

Mr. Marra attended his first sign-holding session in late February and has since joined the sign-holding protests on a weekly basis. He typically stands and waves while others hold signs, although he has helped hold poles to which larger banners are attached. At times, Mr. Marra also holds up the Ukrainian flag to show his support for that country. Like Ms. Quinn, Mr. Marra believes that human connection is a key part of his speech and that it is critical to show his face along with his sign.  As a Southern Connecticut resident, he finds I-95 to be a sort of main street for that part of the state.

For Mr. Quinn, the volume of the vehicles that pass by while he is holding his sign is unbeatable in terms of visibility and getting his message across to different groups of people.

Ms. Quinn and Mr. Marra have joined sign-holding protests in New Haven, Branford, and West Haven, although they are aware that similar groups are showing up to hold signs in other parts of the state. Between them, the two have attended approximately 50 sign-holding protests on overpasses. Before state troopers started detaining, citing, and arresting sign-holders, both Ms. Quinn and Mr. Marra planned to continue joining the sign-holding protests for as long as they took place.

### 1.2.    The defendants, and their statutory authority.

Defendant Garrett Eucalitto is commissioner of Connecticut's Department of Transportation.  As commissioner, Mr. Eucalitto "[a]ct[s] as the executive officer of the Governor for accomplishing the purposes of" the Department of Transportation, Conn. Gen. Stat. § 4-8(a)(2), and may therefore enforce compliance with an injunction from this Court.

Defendant Ronnell Higgins is commissioner of Connecticut's Department of Emergency Services and Public Protection, which includes the state police.  The state police have statewide criminal and motor vehicle law enforcement authority.  Conn. Gen. Stat. § 29-7.  As commissioner, Mr. Higgins has "general jurisdiction of the affairs of the Division of State Police," may "prescribe rules for the government of the division," Conn. Gen. Stat. § 29-2, and may therefore enforce compliance with an injunction from this Court.

**1.3.   Connecticut's state highway system, and use of overpasses spanning state highways.**

Connecticut's Department of Transportation constructs and maintains a highway system linking various points in the state. Conn. Gen. Stat. § 13a-14. That system includes the roads commonly referred to as "interstates." Conn. Gen. Stat. § 13a-15.[1] Defendant Eucalitto "ha[s] jurisdiction over" and "general responsibility for" the state highway system. Conn. Gen. Stat. § 13b-24.

Overpasses spanning state highways are often owned by the state. Regardless, any portion of a road passing over a state highway is, by law, "state highway property," with an automatic easement to the municipality for travel, if the traversing road is a municipal one. Conn. Gen. Stat. § 13a-99a(a).

Limited access highways are a subset of state highways. They are specifically designated state highways that can be entered and exited "only at highway intersections or at designated points." Conn. Gen. Stat. § 13b-27. Entering a limited access highway at a point other than one of the designated entrances is a finable infraction, Conn. Gen. Stat. § 14-238a, as is use of a limited access highway by a pedestrian in contravention to the posted prohibition. Conn. Gen. Stat. § 53-182. Mr. Eucalitto is obligated to revise and publish a list of all limited access highways annually. Conn. Gen. Stat. § 14-298.[2]

Overpasses spanning limited access highways are not necessarily limited access highways themselves. For example, Woodward Avenue in New Haven is a city street with sidewalks on both sides as it passes over I-95. Like Woodward Avenue itself,[3] the

---

[1] Federal and Connecticut law sometimes use the more formal title, "the National System of Interstate and Defense Highways," but the names are interchangeable. Conn. Gen. Stat. § 13a-15.

[2] The most recent list that Mr. Eucalitto has published is Exhibit 3 to the Complaint. Connecticut Dep't of Transportation, *2025 Limited Access State Numbered Highways* (Dec. 31, 2024).

[3] *See id.*

overpass portion of Woodward Avenue is also not a limited access highway, and so pedestrians and bicyclists are free to use it.  By contrast, the overpass by which Interstate 84 traverses Interstate 91 in Hartford is a continuous part of I-84, and the overpass itself is therefore a limited access highway.

But limited access highways are a very narrow exception to Connecticut's otherwise-permissive view of pedestrian road use. Ultimately, pedestrians are allowed on all roads other than limited access ones.  Where a road has "a sidewalk adjacent to such roadway is provided and the use thereof is practicable," a pedestrian must walk on the sidewalk.  Conn. Gen. Stat. § 14-300c(a).  Where there is no sidewalk or using it is impracticable, a pedestrian may walk "on the shoulder [of the road] and as far as practicable from the edge of such roadway."  *Id.*  And where there is neither a sidewalk nor shoulder, a pedestrian may "walk as near as practicable to an outside edge of such roadway."  *Id.*  The only thing pedestrians may *not* do is enter the traveled portion of a road negligently or recklessly, which is a fineable offense.  Conn. Gen. Stat. § 53-182.

### 1.4.    Defendant Eucalitto's sign regulation scheme.

By virtue of his control over the state's highway system, Defendant Eucalitto is in charge of Connecticut's highway sign-permitting scheme.  The relevant statute forbids the "*erection of* outdoor advertising . . . signs . . . within six hundred sixty feet of the edge of the right-of-way, the advertising message of which is visible from the main traveled way of any portion of" an interstate.  Conn. Gen. Stat. § 13a-123(a)(1) (emphasis added).  The state similarly forbids displays farther than 660 feet from the edge of the right-of-way that are "located outside of urban areas, visible from the main

traveled way of the system and erected with the purpose of their message being read from such main traveled way." *Id.*

The permitting statute is broadly interpreted by its implementing regulations, which define § 13a-123's use of the word 'sign' to include "any outdoor sign, display, . . . message . . . poster . . . which is designed, intended or used to advertise or inform." Conn. Agencies Regs. 13a-123-2(h). The regulations define 'erect' as meaning "to construct, build, raise, assemble, place, affix, attach, create, paint, draw, or in any other way bring into being or establish . . . ." Conn. Agencies Regs. 13a-123-2(b).

An interlocking statute controls the content, rather than the placement, of signs within 300 feet of any state highway. That statute—titled "unauthorized signs"—forbids signs using the words "'[s]top,' 'caution,' 'danger,' 'dangerous,' 'warning,' or 'slow.'" Conn. Gen. Stat. § 13a-124. It also bars "any . . . word or character or any . . . symbol intended to give or capable of . . . interfering with traffic." *Id.* But it exempts certain favored messages, such as signs pointing traffic to "agricultural tourism" sites, places where Connecticut-made beer is made or sold, and any farm within ten miles where Connecticut-made wine is made or sold. *Id.*

However, interpretation and enforcement of Defendant Eucalitto's sign statutes is, most charitably, inconsistent. In terms of displaying signs on overpasses, for example, protesters have displayed—or even affixed—signs to overpasses without incident. During President Obama's tenure, protesters dissatisfied with the federal government's actions erected signs along the Howard Avenue overpass in New Haven, one of the same locations visited by Mr. Marra and his sign-holder colleagues in recent months. As photographed and reported by the New Haven Register in 2013, the

protesters attached signs to the fencing along the overpass while waving to traffic below.[4]



By contrast, Ms. Quinn and Mr. Marra have engaged in similar protest actions to wildly different results.[5]



---

[4] New Haven Register, *Anti-Obama Protesters Rally on New Haven I-95 Overpass* (Aug. 30, 2013), https://www.nhregister.com/connecticut/article/Anti-Obama-protesters-rally-on-New-Haven-I-95-11410723.php.

[5] This photograph is an example of a banner held at one of the Visibility Brigade demonstrations.

Meanwhile, American flags are frequently put up on Connecticut overpasses, without apparent repercussions.  Overpasses are also used by demonstrators displaying solidarity with a public employee who has died on the job.  In 2021, for example, firefighters stood on overpasses from New Haven to Hartford to honor a colleague, alongside large flags mounted to their rigs.[6]



Although one of the state statutes threatened against Ms. Quinn and Mr. Marra—and cited in the prosecutions of some of their fellow protesters—forbids signs with "capable of . . . interfering with traffic," or containing the word "[s]top," Conn. Gen. Stat. § 13a-124, Defendants Eucalitto and Higgins have not threatened or prosecuted a law firm whose electronic billboard on I-91 implores motorists with the forbidden word:

---

[6] *See, e.g.*, WTNH, *Firefighters Line overpasses on I-91 from New Haven to Hartford to honor fallen firefighter Ricardo Torres Jr.*, (May 20, 2021), https://www.wtnh.com/news/connecticut/firefighters-line-overpasses-on-i-91-from-new-haven-to-hartford-to-honor-fallen-firefighter-ricardo-torres-jr/.



Nor have the defendants prosecuted advertisers displaying large billboards intentionally designed to attract passing drivers' attention, like this one on I-95 north in Fairfield County:



Nor have they forced the removal of billboard structures close to elevated highways within Connecticut's cities, which place very large advertising at motorists' eye level, as does this example from I-95 south in Bridgeport:



Nor have they taken any action against a Connecticut law firm's notable sequences of billboards, which spread out a short sentence over three billboards to create a message for motorists to follow as they drive I-91:



### 1.5. The defendants forbid certain speech to be displayed to interstate motorists, and cause Ms. Quinn and Mr. Marra to fear prosecution.

When they began their sign-holding protests, Ms. Quinn and Mr. Marra and other sign-holders were able to peacefully come, hold signs for several hours, and

leave without incident. Beginning in February 2025, however, state police employees began detaining sign-holders standing on I-95 overpass sidewalks.

One of the first instances of this occurred in mid-February, when one of Defendant Higgins's employees, Joshua Jackson, stopped a group lawfully standing on the Cherry Hill Road overpass in Branford. Cherry Hill Road is a quiet municipal road that is not a limited access highway.[7]  No barriers prevent pedestrians from walking on the portion of Cherry Hill Road that crosses above I-95, and no signs forbid them from doing so.

On February 14, some of the group were holding signs on Cherry Hill Road. Others had secured posterboards to the inside of the overpass chain-link fencing with bungee cords.  Jackson berated the group for bungee-cording the signs, but went further.  He claimed that "it is unlawful to . . . display any type of sign, in any way, to (sic) any property owned by [the Department of Transportation] including overpasses."[8] He also claimed that "it is unlawful to create distraction for . . . traffic that results in a public disturbance . . . in the form of traffic congestion,"[9] and told the group that *any* sign would distract motorists.

A similar incident occurred in April, when several of Defendant Higgins's employees again stopped a group of sign-holders on Cherry Hill Road. This time, the troopers told the sign-holders that it was "unlawful" to "display any type of sign" on an

---

[7] Connecticut Dep't of Transportation, *2025 Limited Access State Numbered Highways* (Dec. 31, 2024) (attached as Exhibit 3 to the Complaint).
[8] Information and Arrest Warrant App., *State v. Hinds*, No. N23N-CR25-0261993-S, at 5 (Conn. Super. Ct. Aug. 6, 2025) (attached as Exhibit 4 to the Complaint).
[9] *Id.*

overpass,[10] and again claiming that a person incurs criminal liability for creating traffic congestion.[11]

On the morning of Monday, May 19, Jackson again detained sign-holders, including Ms. Quinn and Mr. Marra, this time on Howard Avenue in New Haven. Howard Avenue is a broad residential street that has sidewalks on both sides and is not a limited access highway. The portion of Howard Avenue crossing above I-95 has no barriers or signs barring pedestrians from using its sidewalks.

The group stood on the portion of Howard Avenue that passes over I-95. They displayed signs of varying sizes to passing motorists. Some in the group had again bungee-corded posterboards to the inside of the chain-link fencing lining the portion of Howard Avenue above the interstate. Jackson, appearing irate, tore down the signs on the fence, but did not limit his allegations of illegality to bungee cords. According to Jackson, the protesters were "trespassing" because all overpasses are "private property" of the State; *any* display of signs was illegal; and the protesters would be responsible if any drivers were distracted and got into an accident.

Jackson then demanded everyone's identification for the purpose of checking for outstanding warrants. Some of the people on the sidewalk gently declined to produce identification and expressed surprise that Jackson would check warrants for grey-haired retirees. After discussion with a colleague, Jackson announced that he had received "an emergency call" requiring him to move on. Both Ms. Quinn and Mr. Marra were shaken by this encounter, though they continued to protest (Ms. Quinn less than before).

---

[10] *Id.*
[11] *Id.* at 6.

Finally, on a Saturday morning in July, Mr. Marra and a group of others stood on Stevens Avenue in West Haven, where that street passes over Interstate 95. Stevens Avenue is a short municipal street, and not a limited access highway.[12] The portion of Stevens on which the plaintiffs stood has a sidewalk, and they stood on it. The plaintiffs and the others on the sidewalk held up signs to the traffic below on I-95. They did not attach anything to the overpass structure.

The West Haven police appeared, explaining that the state police asked them to break up the demonstration. Eventually, two state police employees arrived and asked the group to stop displaying their signs. Mr. Marra did not believe that the state police order comported with the First Amendment. But it was obvious to him that the lawfulness of his speech "was not going to be resolved" on a sidewalk with line-level cops.

Mr. Mara was correct. Statements of Defendant Higgins and his employees on the subject of the plaintiffs' rights are alarmingly contrary to the First Amendment's Speech Clause, since they appear to *de facto* hold speakers responsible for listeners' reactions. Defendant Higgins's employee, Joshua Jackson, averred that an overpass speaker "create[s] a distraction for vehicular interstate highway traffic" when the speech "results in . . . traffic congestion or otherwise."[13] Higgins himself, in brushing off two legislators' inquiry into the overpass speech ban, identified the harms he is trying to combat as "distracting motorists,"[14] indicating that he shares his employee's view that a speaker

---

[12] Connecticut Dep't of Transportation, *2025 Limited Access State Numbered Highways* (Dec. 31, 2024) (attached as Exhibit 3 to the Complaint).
[13] Information and Arrest Warrant App., *State v. Hinds*, No. N23N-CR25-0261993-S, at 6 (Conn. Super. Ct. Aug. 6, 2025) (attached as Exhibit 4 to the Complaint).
[14] Letter from Ronnell Higgins to Sen. Bob Duff and Rep. Anne Hughes, at 2 (Aug. 19, 2025) (attached as Exhibit 6 to the Complaint).

may be held responsible for a listener's reaction, and, that a speaker's criminal liability can vary with the contents of their speech: the more 'distraction' it causes any listener, the more culpable the speaker.

On July 19, Defendant Higgins significantly ratcheted up the threats against peaceful overpass protesters like Ms. Quinn and Mr. Marra.  On that day, one of his employees arrested Katherine Hinds, a seventy-one year-old retiree, for displaying signs from an overpass sidewalk above I-95 in Fairfield County.  Higgins's employee charged Ms. Hinds with breach of peace, trespass—purportedly because the state police had verbally barred her from displaying signs from overpasses on an earlier occasion, and violating the 'unauthorized signs' statute, Conn. Gen. Stat. § 13a-124 (barring signs "capable of . . . interfering with traffic").

But his employees weren't done.  On August 8, the state police arrested Ms. Hinds at her home, pounding on her door at 6:00 a.m. in a "show of force" that her counsel described as only necessary when "taking down a gang or drug related operation," when the arrestee is "a dangerous target."[15] The state police had combed Ms. Hinds's social media and obtained an arrest warrant for her prior protest activity, alleging in relevant part that it is illegal to display *any* sign from an overpass sidewalk.[16] The police used the dawn apprehension of Ms. Hinds in her pajamas to charge her with breach of peace (purportedly for causing traffic *on I-95*), trespass, and violating the unauthorized sign statute.

---

[15] Stephen Underwood, *A 71-year-old CT Activist has Been Arrested Twice by State Police. Her Lawyers Allege Retribution*, Hartford Courant, https://www.courant.com/2025/08/20/a-71-year-old-ct-activist-has-been-arrested-twice-by-state-police-her-lawyers-allege-retribution (Aug. 20, 2025).
[16] Information and Arrest Warrant App., *State v. Hinds*, No. N23N-CR25-0261993-S, at 5 (Conn. Super. Ct. Aug. 6, 2025) (attached as Exhibit 4 to the Complaint).

Defendant Higgins continued his prosecution of peaceful speakers a week later. On August 14, his employees ticketed seven people displaying signs from an overpass spanning the Merritt Parkway, in Fairfield.  Once again, the state police charged the protesters with violating the unauthorized sign statute, § 13a-124.

Both Ms. Quinn and Mr. Marra know Ms. Hinds and quickly learned of her arrests. They also found about the citation of the Merritt overpass protesters.

For both Ms. Quinn and Mr. Marra, the arrests confirmed that they could no longer protest on overpasses. Ms. Quinn had already been shaken by her May encounter with state police. As the primary caretaker of two children, she feels she can no longer tolerate the risk of being harassed or potentially arrested by police for her protest activities. She has decided to stop holding signs until this Court rules on the legality of the sign-holders' peaceful demonstrations.

For Mr. Marra, similarly, the pattern of disruption, the defendants' other protester prosecutions, and the "fluid reasoning" in the state police's cited authority for forbidding speech left no doubt in his mind that arrest was a substantial possibility if he continued to demonstrate. The arrest of Katherine Hinds was the final straw. He decided to stop holding signs on overpasses until this Court rules.

In the meantime, the plaintiffs are entirely unable to reach their intended audience of interstate drivers.  The defendants freely permit up to 900 square foot electronic billboards to dominate the viewshed of Connecticut interstates, even as they forbid Mr. Marra and Ms. Quinn from holding small signs. But renting billboard space for their messages is not an option for the plaintiffs. According to an outdoor advertising industry executive, space on Connecticut's interstates ranges from "$400 to $1,700 per

week billed on a 4-week period."[17]  The price varies by "the [a]verage [d]aily [t]raffic, the demography of the traffic ([a]ge and income of the passengers), the geographic reach of the traffic (where the vehicular trips originate and terminate) and the frequency that the traffic passes the location in a week."[18]

### 2.    The preliminary injunction standard.

A preliminary injunction is warranted where the moving party demonstrates (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, and (3) that an injunction is in the public interest.  *E.g.*, *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).  Here, Ms. Quinn and Mr. Marra seek a prohibitory injunction, because their request that the defendants stop enforcing their sidewalk speech ban preserves "the last actual, peaceable uncontested status which preceded [this] controversy": their speech before the defendants began threatening them for it.  *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (cleaned up).

### 3.    The defendants' overpass speech ban is unconstitutional whether framed as one barring some signs, or as one barring all signs, and so Mr. Marra and Ms. Quinn will succeed on the merits of their claim.

There is no question that overpass streets and sidewalks are traditional public fora that merit the highest levels of First Amendment protection. The defendants must therefore prove the constitutionality of their attempts to limit the plaintiffs' expression.

---

[17] Declaration of John Barrett (attached as Exhibit 5 to the Complaint) at ¶ e.
[18] *Id.*

They have two options: defending their speech ban as a selective ban (content-based), or as a total ban (content-neutral). Either way, they cannot succeed.

Content-based bans receive strict scrutiny. A selective overpass speech ban fails strict scrutiny because it gauges a message's legality by a listener's reaction, and, is not the least-restrictive means of preventing distracted driving.

Content-neutral bans receive intermediate scrutiny.  Here, a total ban fails intermediate scrutiny for its lack of narrow tailoring and ample alternative channels through which the plaintiffs may reach interstate drivers.

Because the defendants will not be able to justify their speech ban no matter which way they splice it, the plaintiffs can demonstrate the requisite likelihood of success on the merits for a preliminary injunction.


### 3.1.    Overpass streets and sidewalks are public fora.

Ms. Quinn and Mr. Marra seek to continue speaking from overpass streets and sidewalks.  Those locations receive the highest level of First Amendment protection, undiminished by whatever restrictions may apply to the highways they pass over.

"[T]he level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs." *Peck ex rel. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005), creating a sliding scale from most-protected to least.  At the top of the scale lie traditional public fora, where the ability of a state to limit expression is "sharply circumscribed."  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

Streets and sidewalks are traditional public fora. From the colonial era onward, they have "been used for . . . communicating thoughts between citizens," *Boos v. Barry*,

485 U.S. 312, 318 (1988) (cleaned up).  No sidewalk-by-sidewalk analysis is required or appropriate; instead, "all public streets are held in the public trust and are properly considered traditional public fora." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). *See id.* at 480 (explaining that the public forum conclusion "follow[s] automatically" from the location being a public street or sidewalk).

The overpass sidewalks on which Ms. Quinn and Mr. Marra wish to demonstrate are traditional public fora.  They are a part of the municipal street network, and are not separated in any way so as, for example, to end the street network and reserve the overpass for a different use.  Their proximity to an interstate cannot alter the conclusion.  Just as a city street does not become a limited access highway merely by running above one, a street or sidewalk does not shed its status as a public forum when it runs next to, or above, an area that is not one.  The First Amendment's protections do not wane if a given sidewalk passes by a piece of private property to which the Amendment does not apply, or, if the character of the area through which it runs changes over the course of the sidewalk.  "[A] public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Id.* at 480.  The same goes if it runs above a state highway.  "Traditional public forum property . . . will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *United States v. Grace*, 461 U.S. 171, 180 (1983) (striking statute barring the display of signs or banners on the Supreme Court grounds, as applied to sidewalks on those grounds connected to and "indistinguishable from any other sidewalks in Washington, D.C.").

Short of physically cutting Connecticut overpasses off completely from the local street network, the defendants are stuck with the public forum conclusion. They may not, for example, just eviscerate sidewalks' status by fiat or legislation, as might be possible with lesser-protected forums. *Id.*

Nor may they jettison a sidewalk's public forum status by issuing move-on orders and threatening (or charging) trespass if the person returns. First, doing so violates the Speech Clause. *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) (holding that protests may not be shut down absent the "clear and present danger" of an "immediate threat to public safety, peace, or order"); *see also Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (explaining that *Cantwell* means that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest"). Second, such orders violate the Due Process Clause. *E.g.*, *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965) (striking for-any-reason move-on ordinance as "constitutional vice [that] needs no demonstration" because it subjects the right to be on a public sidewalk to "the whim of any police officer"); *City of Chicago v. Morales*, 527 U.S. 41, 65 (1999) (striking same type of ordinance for same reason). *Cf. Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969) (Black & Douglas, JJ., concurring) ("To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws.").

The streets and sidewalks at issue here are immutably public fora. *E.g.*, *Picard v. Magliano*, 42 F.4th 89, 102 (2d Cir. 2022). Defendants Eucalitto and Higgins are therefore obligated to prove the constitutionality of their overpass speech ban. *E.g.*, *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022).

### 3.2.    A selective overpass speech ban fails strict scrutiny, and a total ban fails intermediate scrutiny.

The defendants' explanations for whether and how overpass speech may be punished are difficult to pin down, and offer the Court a fork in the analytical road depending on what bases are asserted here. If the defendants propose to carry their burden by contending that § 13a-124 applies only to certain signs—those that do not "interfer[e] with traffic" or contain the word "[s]top," for example—then they must satisfy strict scrutiny.  They cannot do so: Speech bans that vary with a listener's reaction to the speech are flatly unconstitutional, and regardless, a content-dependent overpass speech ban is not the least-restrictive means of preventing road crashes, and so the ban is unconstitutional.

If, on the other hand, the defendants try meeting their burden by claiming that § 13a-124 alone or in combination with any other source of law bars *all* overpass speech, then they must prove that a total overpass speech ban is narrowly tailored and leaves the plaintiffs alternative channels to reach interstate drivers.  But Connecticut claims plenary control over the interstate viewshed—thus robbing the plaintiffs of any alternative channel—and the defendants simultaneously admit exceptions that permit the very harm they claim to remedy through a total speech ban. As a result, whether the defendants claim only some overpass speech is restricted (a content-based ban), or that all of it is (a content-neutral ban), their ban fails the requisite inquiry.

### 3.2.1. An overpass speech ban applicable only to certain messages depending on drivers' reactions to them is not narrowly tailored, and is not the least-restrictive means of maintaining motorists' duty to drive safely.

If the defendants try to justify their overpass speech ban as one that applies only to certain speech, either because of the words used or its alleged traffic-generating effects, then the defendants must justify their ban as a content-based one. A content-based speech restriction is one that "applies to particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 155 (2015)—that is, if the restriction depends on the speech at issue.

The 'unauthorized sign' statute that the defendants have used and threatened is a straightforward content-based restriction. First, most of its scope depends on the contents of the sign. It overtly bars signs containing the words "'[s]top,' 'caution,' 'danger,' 'dangerous,' 'warning,' or 'slow.'" Conn. Gen. Stat. § 13a-124. It exempts certain favored messages, including: "directional sign[s]" pointing motorists to "farming that is part of the state's agricultural tourism," "facilities . . . where Connecticut-made beer is manufactured or sold, including, but not limited to, signs or notices containing the words 'Connecticut Brewery Trail'," and "any farm" within ten miles "where Connecticut-made wine is manufactured or sold, including, but not limited to, signs or notices containing the words 'Connecticut Wine Trail.'" *Id.* And, it contains an amorphous catch-all allowing signs otherwise violating the statute so long as they are displayed "with the approval or under the direction of the commissioner." *Id.*

Second, one of the statute's prohibitions—the very one threated against the plaintiffs and actually charged against Katherine Hinds—is determined by a listener's reaction to speech. The statute bars signs bearing "any . . . word or character or any . . .

symbol intended to give or capable of . . . interfering with traffic." *Id.* The defendants—

and one of Defendant Higgins's employees—take the view that signs violate the

interference-with-traffic portion of § 13a-124 when they "distract[] motorists,"[19] or

create a traffic "slow-down"[20] or "congestion."[21] But applying § 13a-124 to a sign-holder

based upon the actions of passing motorists is pure content-based selection amongst

expression. The milquetoast or inscrutable message may draw no reaction whatever

from passing motorists and so create no "slow-down" or "congestion," while a funny or

widely popular message may prompt something else. And hence, "[l]isteners' reaction

to speech is not a content-neutral basis for regulation." *Forsyth Cnty., Ga. v.*

*Nationalist Movement*, 505 U.S. 123, 135 (1992) (striking municipal permitting scheme

charging sliding-scale fee based on how police thought crowd would react to permittee).

Defendants Eucalitto and Higgins therefore bear the burden of satisfying strict scrutiny

here.

But doing so is impossible. A content-based restriction is presumptively invalid,

and engenders strict scrutiny. *E.g.*, *Friend v. Gasparino*, 61 F.4th 77, 91 (2d Cir. 2023).

Under that review, the restriction can only be saved if its proponent proves that it is

"necessary to serve a compelling state interest and . . . narrowly drawn to achieve that

end." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Narrow

tailoring for strict scrutiny purposes is an exceedingly difficult threshold, because it

requires the proponent of a speech ban to prove that it has used "the least restrictive

means to achieve its ends." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233,

---

[19] Letter from Ronnell Higgins to Sen. Bob Duff and Rep. Anne Hughes, at 2 (Aug. 19, 2025) (attached as Exhibit 6 to the Complaint).
[20] *Id.*
[21] Information and Arrest Warrant App., *State v. Hinds*, No. N23N-CR25-0261993-S, at 3 (Conn. Super. Ct. Aug. 6, 2025) (attached as Exhibit 4 to the Complaint).

246 (2d Cir. 2014).  When a less restrictive alternative exists, the ban fails.  *E.g.*, *Reno v. ACLU*, 521 U.S. 844, 874 (1997); *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989); *Landell v. Sorrell*, 382 F.3d 91, 126 (2d Cir. 2004), *rev'd and remanded on other grounds sub. Nom. Randall v. Sorrell*, 548 U.S. 230, 236 (2006).

**3.2.1.1.    Punishing a speaker for the acts of a listener over whom they have no control is not a narrowly tailored means of deterring or punishing bad acts by the listener.**

Whether the defendants intend to justify their speech ban as the product of § 13a-124, a criminal statute like breach of peace, or some combination thereof, they will run aground.  The Speech Clause bars the government from shifting responsibility for a listener's reaction to the speaker.

"The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," and so punishing a person's speech "in order to deter conduct by a non-law-abiding third party" is "quite remarkable" for its ill fit to the deterrence goal.  *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) (barring application of wiretap statute's civil liability provision to innocent third party who publicized the wiretapped conversation but had no role in obtaining it).  Were that not the rule, speakers would become responsible for listeners, and censor themselves out of fear that a listener's illegality be imputed to them.  Seminal civil rights and worker's rights cases completely foreclose that arrangement, and so bar the defendants from applying the unauthorized sign, disorderly conduct, or breach of peace statutes to the plaintiffs here.  *See Cox v. State of La.*, 379 U.S. 536, 551 (1965) (reversing breach of peace conviction on First Amendment grounds because the statutory language

24

permitted conviction for "agitat[ing]" or "disquiet[ing]" others, a scope so far broader than preventing imminent violence as to "allow persons to be punished merely for peacefully expressing unpopular views"); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963) (same where broad statutory violation founded on nothing more "than that the opinions which . . . were peaceably express[ed] were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection"); *Thornhill v. State of Alabama*, 310 U.S. 88, 104 (1940) ("[T]he group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests.").

Connecticut courts have accounted for this rule by narrowing general-purpose breach of peace or disorderly conduct statutes to apply only where a speaker incites imminent violence by intentionally using fighting words (breach of peace and disorderly conduct) and acting with intent to disrupt or disturb others (disorderly conduct). *See State v. Baccala*, 326 Conn. 232, 234 (2017) (noting that "[t]he broad language of Connecticut's breach of peace statute" has been limited to "those words that have a direct tendency to cause acts of violence") (internal quotation omitted); *State v. Parnoff*, 329 Conn. 386, 394, 397-98 (reversing the defendant's conviction for disorderly conduct because his speech was unlikely to "provoke an imminent violent reaction") (internal quotation omitted); *State v. Indrisano*, 228 Conn. 795, 809 (1994) (clarifying that "in order to support a conviction for disorderly conduct, the defendant's predominant intent must be to cause inconvenience, annoyance or alarm, rather than to exercise his constitutional rights"). Requiring the speaker to *intend* the disruption avoids the Speech Clause violation that would flow from punishing a speaker for something beyond

their control: a listener's inability or unwillingness to follow the law.  And so it goes

here.  Connecticut drivers bear the duty to obey the state's safe-driving laws.  If they are

incapable of controlling their behavior upon being presented with political speech and a

friendly wave from an overpass, the responsibility is theirs alone.

> ### 3.2.1.2.    Diligent enforcement of Connecticut's traffic and criminal codes are less-speech-restrictive means of combatting distracted driving, and so an overpass speech ban may never be the least-restrictive means of doing so.

The second strict scrutiny tailoring wall that the

defendants collide with is the least restrictive means rule.  That rule notably does not

ask whether a speech restriction "has some additional ability to achieve" a governmental

interest, as "[a]ny restriction on speech could be justified under that analysis." *Ashcroft

v. ACLU*, 542 U.S. 656, 666 (2004).  Instead, it asks whether the restriction "is the least

restrictive means among available, effective alternatives."  *Id.*  And so, the defendants

may not salvage a selective overpass speech ban on the grounds that it has some non-

zero effect on distracted driving.  Instead, they must justify the ban as against other

methods of punishing and deterring drivers from failing to pay attention to the road (or

worse).

The defendants cannot do so. Connecticut has a full range of civil and criminal

statutes barring drivers from failing in their duty to drive safely, and, barring protesters

from intentionally interrupting interstate traffic.  Those statutes' existence forecloses the

defendants from restricting speech in the interest of combatting those harms.  *See, e.g.,

United States v. Alvarez*, 567 U.S. 709, 729 (2012) (striking federal statute penalizing

false claims about receipt of military medals where there existed "at least one less

speech-restrictive means by which the Government could likely protect the integrity of

the military awards system," *i.e.*, establishing a public database listing Medal of Honor

recipients); *Ashcroft*, 542 U.S. at 668 (affirming preliminary injunction against internet

content restrictions where government failed to show that alternatives like parental

control filters would not suffice); *Reno v. ACLU*, 521 U.S. 844, 878-79 (1997) (striking

federal statute barring "indecent" and "patently offensive" material from the internet

where government failed to show that parental controls would not suffice).

### 3.2.2. A total overpass speech ban would also be unconstitutional, for lack of narrow tailoring and availability of ample alternative channels to reach interstate drivers.

Alternatively, the defendants might claim that their overpass speech

ban is a content-neutral one, because it forbids the display of "*any* type of sign, in *any*

*way*, to (sic) any property owned by [the Department of Transportation] including

overpasses."[22]  Content-neutral sidewalk speech restrictions—sometimes shorthanded

as 'time, place and manner' ones—are those that do not choose among messages, but

require all expression to shift location, medium, or hour in a way "largely immaterial to

the exercise of the right."  *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 73 (2d Cir.

2025).  Content-neutral sidewalk speech restrictions must be stricken unless they "serve

a significant government interest," are "narrowly tailored" to accomplish that interest,

and "leave open ample alternative channels of communication." *Zalaski v. City of

Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (cleaned up).  A total ban on

---

[22]  Information and Arrest Warrant App. 2, *State v. Hinds*, No. N23N-CR25-0261993-S, at 3 (Conn. Super. Ct. Aug. 6, 2025) [Complaint Exhibit 4].

overpass speech is neither narrowly tailored, nor leaves open ample means by which Mr. Marra and Ms. Quinn could speak to interstate drivers.

### 3.2.2.1. A total overpass speech ban is not narrowly tailored to combat driver distraction where the defendants overtly permit many forms of advertising in the same viewshed.

To surmount narrow tailoring scrutiny, a content-neutral speech restriction may not throttle substantially more speech than necessary to further a legitimate government interest, as happens when a substantial portion of the speech-restrictive burden does not advance the government's goals. *E.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).[23]  The first fatal tailoring problem in any complete overpass speech ban is that Defendant Eucalitto affirmatively allows other signs within the interstate viewshed, most quite large.  The statutory exceptions allowing for those other signs mean that the defendants cannot forbid core political speech by overpass pedestrians.

To start with, Defendant Eucalitto's sign-permitting statute sets out a blanket prohibition against all signage (1) in urban areas, within 660 feet of the highway right of way's edge, and (2) in rural areas, at any distance at all provided that the sign can be seen from the traveled portion of the highway.  Conn. Gen. Stat. § 13a-123(a)(1).  But it then opens exceptions that any regular traveler of Connecticut interstates will recognize as swallowing the rule:

> Notwithstanding the provisions . . . of this section, signage that may be
> changed at intervals by electronic or mechanical process or by remote
> control shall be permitted within six hundred sixty feet of the edge of the

---

[23] The narrow tailoring inquiry applicable to a content-neutral speech restriction is less exacting than the one applicable to a content-based one, and so any tailoring deficiency sufficient to defeat a content-neutral speech ban necessarily defeats a content-based one as well.

> right-of-way . . . , except as prohibited by state statute, local ordinance or
> zoning regulation, provided such signage
>> (1) has a static display lasting no less than eight seconds,
>> (2) achieves a message change with all moving parts or illumination
>> moving or changing simultaneously over a period of three seconds or
>> less, and
>> (3) does not display any illumination that moves, appears to move or
>> changes in intensity during the static display period.

Conn. Gen. Stat. § 13a-123(f).  As with all other permitted signs, such electronic

billboards may be up to 900 square feet large, so long as the advertising space is no

more than either twenty-five feet high or sixty feet long.  Conn. Agencies Regs. § 13a-

123-13(c).

Large electronic billboards are not where the exceptions stop, however.  The

statute also sets out loopholes for "signs, displays or advertising devices" that are "in

place for sixty days or less," Conn. Gen. Stat. § 13a-123(e)(4), "within areas owned,

leased or managed by a public authority" for certain land uses including "airport

development zones," *id.* § 13a-123(e)(5)(A), and "upon . . . structures . . . in the custody

or control of the state and designed, operated or intended to be operated for the purpose

of presenting athletic, artistic, musical or other entertainment events."  *Id.* § 13a-

123(e)(5)(B).  And, the statute expressly allows another source of visual clutter in an

interstate driver's viewshed: vehicle-mounted advertising.  Nothing in the permitting

statute "shall prohibit the erection or maintenance of . . . signs upon . . . personal

property . . . ."  Conn. Gen. Stat. § 13a-123(a)(3).

The overt permission for 900-square-foot electronic signs, and for vehicle-

mounted ones, renders any part of the sidewalk speech ban resting on the § 13a-123

sign-permitting statute fatally underinclusive.  If the defendants are concerned about

reducing driver distraction, a speech restriction reaching so little of the purportedly

problematic conduct—900 square foot signs ok, three square foot signs not—does not advance the defendants' purported interest. *See*, *e.g.*, *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 104-05 (1979) (statute barring newspapers, but not electronic media, from publishing names of juvenile proceeding respondents "does not accomplish its stated purpose" of protecting those names). Here, the defendants' carveout-riddled blanket prohibition vitiates the idea that the measure is tailored at all, let alone narrowly. *See, e.g., Am. Ass'n of Pol. Consultants, Inc. v. F.C.C.*, 923 F.3d 159, 168-69 (4th Cir. 2019) (explaining that robocall statute's government-debt exception "exposes millions of American consumers to some of the most disruptive phone calls they receive").

And, permitting signs ten times as large as Ms. Quinn's or Mr. Marra's raises the specter that the defendants are not so concerned with driver distraction so much as impeding certain speech. "[W]here the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive." *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004) (footnote omitted). The defendants' sidewalk speech ban "regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015) (emphasis in original), and thus cannot be constitutional.

### 3.2.2.2. The sidewalk speech ban fails narrow tailoring because the defendants have "too readily forgone" other means of controlling interstate drivers' behavior, including the entire state traffic code.

Additionally, to meet the content-neutral narrow tailoring inquiry, a speech restriction's proponent must prove "that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). The defendants here have taken the easy way out that is squarely forbidden by *McCullen*. There, the Massachusetts legislature created small buffer zones outside of certain healthcare facilities, within which no one was permitted to enter or remain absent certain exceptions irrelevant here. Massachusetts justified the ban by citing its interest in preventing harassment of patients seeking abortion care and the deliberate blocking of facility entrances. *Id.* at 490. But the ban fell under intermediate content-neutral narrow tailoring review. Striking the ban, the Supreme Court concluded that Massachusetts had skipped over non-speech-restrictive tools at its disposal to control the behavior of protesters: local ordinances barring the obstruction of sidewalks, the state's "criminal statutes forbidding assault, breach of the peace . . . and the like," and civil remedies. *Id.* at 492. *See also Cornelio v. Connecticut*, 32 F.4th 160, 174 (2d Cir. 2022) (holding that "the government must explain why criminal sanctions that do not implicate the First Amendment would not provide adequate deterrence" to survive the content-neutral narrow tailoring inquiry). In *McCullen*, the availability of non-speech-restrictive measures "capable of serving [Massachusetts's] interests" invalidated the speech ban, *id.* at 494, because their existence meant that the state had "too readily

forgone options that would serve its interests just as well, without substantially

burdening the kind of speech in which [protesters] wish to engage." *Id.* at 490.

*McCullen*'s narrow tailoring analysis is similar to lower court decisions on

streetside solicitation bans.  In *Comite de Jornaleros de Redondo Beach v. City of

Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011), the Ninth Circuit held that a

municipal ordinance barring roadside solicitation failed content-neutral narrow

tailoring review because the municipality's claimed interest in preventing traffic

accidents or solicitors in the roadway could easily be met by "other laws at its disposal

that would allow it to achieve its stated interests while burdening little or no speech."

*Id.* (citing California's prohibitions against jaywalking, stopping in traffic alongside a

red-painted curb, and stopping a car so as to obstruct traffic).  The Ninth Circuit

reached the same conclusion when assessing a similar Arizona ordinance that same

year, where the defendant municipal official provided no evidence that existing traffic

and criminal laws were insufficient to address the traffic safety concerns it cited.  *Valle

Del Sol Inc. v. Whiting*, 709 F.3d 808, 827 (9th Cir. 2013).  Our own circuit affirmed the

Eastern District's striking of a day laborer solicitation ordinance where the defendant

municipality possessed "a number of less burdensome alternatives to address street and

sidewalk safety," such as prohibitions against pedestrians entering traffic, driving at a

slow speed that impedes traffic, parking unlawfully, and jaywalking.  *Centro de la

Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 117 (2d Cir.

2017) (citing *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster

Bay*, 128 F. Supp. 3d 597, 619 (E.D.N.Y. 2015) (collecting statutes)).

The First Circuit reached the same conclusion in *Cutting v. City of Portland*, 802

F.3d 79, 91-92 (1st Cir. 2015), striking an anti-solicitation ordinance affecting sidewalks

and medians.  That court faulted Portland, Maine's failure to use "existing state and local laws that prohibit disruptive activity in roadways," or, to narrow existing ordinances to the specific conditions purportedly justifying its speech restrictions in those locations.  *Id.*

The reasoning of *McCullen*, *Valle del Sol*, *Comite de Jornaleros*, *Centro de la Comunidad*, and *Cutting* requires the same conclusion here.  Connecticut law already provides myriad tools to guard against poor driving in response to seeing core political speech on a sign.  Among other things, the state's vehicle code provides ample civil and criminal guardrails against driver misbehavior.  *See* Conn. Gen. Stat. § 14-220(a) (forbidding driving on highway "at such a slow speed as to impede or block the normal and reasonable movement of traffic"); *id.* § 14-240(b) (following "more closely than is reasonable and prudent"); *id.* § 14-240a(a) (following too closely "with the intent to harass or intimidate"); *id.* § 14-236 (requiring drivers on multi-lane roads to stay as "nearly as practicable entirely within a single lane," and barring lane-changes before "the driver has ascertained that such movement can be made with safety"); *id.* § 14-232(a) (controlling passing on the left); *id.* § 14-233 (controlling passing on the right); *id.* § 14-218a(a) (catch-all traveling at speed "greater than is reasonable" for conditions); *id.* § 14-219(a) (speeding); *id.* § 14-122(a) (reckless driving); *id.* § 14-222a (causing the death of another "in consequence of the negligent operation of a motor vehicle"); *id.* § 14-296aa(b) (barring use of hand-held mobile devices while driving).

Connecticut's civil and criminal traffic code provisions, its "generic criminal statutes," and its common law of torts all provide ample means to deter and control the harms the defendants here seek to control by silencing speech.  *McCullen*, 573 U.S. at

492.  A total overpass speech ban is therefore not narrowly tailored to combat distracted driving.

> ### 3.2.2.3.     In addition to failing narrow tailoring review, the defendants' speech ban fails to leave open ample alternate channels of communication.

Even content-neutral speech restrictions that <u>are</u> narrowly tailored—and a complete overpass speech ban is not—must be stricken if they do not provide ample alternative channels of communication.  *E.g.*, *Clark v. Comty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  The key yardstick is the identity of the audience in the substitute time, place, or manner, because the government's forced shift of speech to a different time, place, or manner must be "largely immaterial to the exercise of the right," *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 73 (2d Cir. 2025).  No meaningful alternative exists in moving a speaker from the front of the state capitol, for example, to a place across town on the theory that *someone* will hear the speech wherever it occurs.

So, for example, the union wishing to leaflet Lincoln Center patrons has sufficient alternative channels "where neighboring . . . [p]arks, and the public sidewalks surrounding Lincoln Center" are open.  *Hotel Emps. & Rest. Emps. Union v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 556 (2d Cir. 2002).  And the speakers wishing to address attendees of a national political convention at Madison Square Garden have alternative channels to do so from a designated demonstration space one block from the Garden where "there are many ways to arrive at the Garden," and "[m]any" of the speakers' intended audience—delegates to a national political convention—"may have traveled to the Garden by a route that brought them close to the

[designated] demonstration zone." *Marcavage v. City of New York*, 689 F.3d 98, 108 (2d Cir. 2012).

But here, Defendant Eucalitto exercises complete control over anything that may be viewed within 660 feet of Connecticut's interstates, and bars all signs other than those he permits. Conn. Gen. Stat. § 13a-123. Interstates are limited access highways from which Ms. Quinn and Mr. Marra are forbidden to enter as pedestrians, so they cannot walk alongside the interstates displaying their signs. The defendants' overpass speech ban functionally prevents them from speaking to their intended audience at all.

It is no answer that Mr. Marra and Ms. Quinn may try purchasing space on one of the close-to-the-interstate billboards that Defendant Eucalitto allows. Billboard space is expensive, running around $1600 per month on the low end.[24] And, it is not just Ms. Quinn's and Mr. Marra's for the asking. Space may not be available because advertisers have booked up the space months (or even years) in advance. *See Bery v. New York City*, 97 F.3d 689, 698 (2d Cir. 1996) (striking municipal art sale permitting scheme in part based on lack of alternate channel for display of artwork, reasoning that the existence of private galleries was insufficient even if plaintiffs "could get their works accepted for showing"). Nor is it sufficient to note that sign speech is just one method of addressing passing motorists. In theory, the plaintiffs could play music or speak loudly to the passing traffic, but in practice, highway traffic generates too much noise for Mr. Marra and Ms. Quinn to get their message across via any other way but visually.

In the unique context of Connecticut's interstates, where both signage and pedestrian access are completely regulated, the government exercises plenary control

---

[24] Declaration of John Barrett (attached as Exhibit 5 to the Complaint) at ¶ e.

over the visual transmission of information within its boundaries except for overpass sidewalks. Barring speech on those sidewalks leaves no alternative means by which the plaintiffs may reach interstate drivers, and therefore violates the Speech Clause.

### 3.3.  The sidewalk speech ban forces Ms. Quinn and Mr. Marra to choose between speaking and being criminally prosecuted, thus creating irreparable harm.

A plaintiff whose claim involves the alleged deprivation of a constitutional right—particularly a First Amendment one—is presumed to have established irreparable harm, *e.g.*, *New York Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because they face loss of liberty or loss of the ability to speak, Mr. Marra and Ms. Quinn meet the requirements for irreparable harm meriting an injunction. *Reyes v. New York City*, 141 F.4th 55, 68 (2d Cir. 2025).

### 3.4.  Preserving Ms. Quinn and Mr. Marra's right to speak is a paramount public interest, as an order doing so would enforce government obedience to the Constitution.

In the typical litigation, a preliminary injunction-seeker bears the burden of showing that the balance of equities in issuing the injunction tips towards them and that issuance of the injunction lies in the public interest. *E.g.*, *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). But in litigation attempting to force the government to abide by the law, those two inquiries merge. *E.g.*, *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020). Ms. Quinn and Mr. Marra easily clear the unified inquiry.

"A preliminary injunction is in the public interest if [it] would not cause harm to the public interest." *S.E.C. v. Citigroup Global Markets*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (cleaned up). The public, of course, has a paramount interest in "ensuring that the government complies with its obligations under the law and follows its own procedures," *Medina v. Dep't of Homeland Security*, 313 F. Supp. 3d 1237, 1252 (W.D. Wash. 2018), which is to say that paradigmatic public interest is ensuring that the government abides by the law. And so, "a general requirement to follow the law does not impose a hardship" on the government. *Disability Rts. N.Y. v. New York State Dep't of Corr. & Community Supervision*, No. 21-cv-739, 2022 WL 484368, at *13 (N.D.N.Y. Feb. 17, 2022). *Accord, e.g., Volokh v. James*, 656 F. Supp. 3d 431, 447 (S.D.N.Y. 2023) (inquiry satisfied in free speech dispute where "enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest, and that Defendant[s] can show no harm as a result of being prevented from enforcing an unconstitutional statute").

### 3.5. Because Ms. Quinn and Mr. Marra seek to vindicate their constitutional rights, they should not be made to post an injunction bond.

Rule 65 (c) provides, in part, that a party granted a preliminary injunction must give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Yet federal courts routinely waive the security requirement where litigation challenges the infringement of a constitutional right. *See, e.g., Pharmaceutical Soc'y of N.Y. v. N.Y. Dep't of Soc. Servs.*, 50 F.3d 1168, 1175 (2d Cir. 1995) (affirming waiver where case was "pursued to enforce public interests"); *Greenwich Bd. of Educ. v. Torok*, No. 03-cv-

1407, 2003 WL 22429016, at *3 n.7 (D. Conn. Oct. 22, 2003) (waiving bond where the requirement could "discourage children and their parents from enforcing their federal rights"). Here, Mr. Marra and Ms. Quinn seek preliminary injunctive relief to avoid significant infringement on their First Amendment rights. The Court should therefore waive the security requirement in keeping with its ample discretion under Fed. R. Civ. P. 65.

**4.     Conclusion**

For the above reasons, the Court must grant Mr. Marra and Ms. Quinn a preliminary injunction barring the defendants from enforcing the sidewalk speech ban against them until judgment issues.

                                        ___/s/ Dan Barrett___
                                        Dan Barrett
                                        Elana Bildner
                                        Jaclyn Blickley
                                        ACLU Foundation of Connecticut
                                        P.O. Box # 320647
                                        Hartford, CT 06132
                                        (860) 471-8471
                                        e-filings@acluct.org