**United States District Court**
**District of Connecticut**

**Erin Quinn and Robert Marra**,
*Plaintiffs,*

No. 25-cv-1548

*v.*

November 24, 2025

**Ronnell Higgins,**
*Defendant.*

**Renewed Motion for Preliminary Injunction**

This case is about two people's ability to hold up signs on Connecticut sidewalks, without fear that the Connecticut State Police will continue to interrupt such speech in an attempt to enforce an extra-legal belief that peaceable sign-holding near interstate highways ought to be illegal.

Erin Quinn and Robert "Bob" Marra are part of loosely affiliated groups of Connecticut residents committed to expressing dissent with federal government actions by peacefully displaying signs on various highway overpasses across the state. The signs contain a variety of messages, including: "Due process is the law," "These voices melt ICE," "No kings," "Love Liberty? Resist Tyranny," and "Hands Off Our Judges." The sign-holders, many of them older people who are retired from full-time employment, informally communicate with each other to plan when and where to hold their signs. They then drive to a nearby location at the appointed time, park in legal parking spots, and walk onto the overpasses, where they typically stand with 3-6 other people and hold their signs while waving. They then go home.

Informal groups of sign-holders have been peacefully holding signs on Connecticut overpasses since the November 2024 election, but most, like Ms. Quinn and Dr. Marra, began in earnest after January's presidential inauguration. For several

weeks, they ran into no issues. Starting in February 2025, however, state police employees began detaining sign-holders standing on overpass sidewalks, justifying their actions on a variety of non-criminal Department of Transportation authorities, or criminal statutes that cannot be applied to protected speech.  Police intervention became more and more frequent, to the point that some of Dr. Marra and Ms. Quinn's fellow protesters were issued citations, and in one case, even arrested. Although committed to the cause and confident that their actions comport with the First Amendment and Connecticut law, Ms. Quinn and Dr. Marra are forced to choose between staying silent or risking temporary seizure, arrest, or prosecution.  They now turn to this Court for a simple injunction stating they have a First Amendment right to hold signs on overpasses that are not themselves limited-access highways, regardless of whatever rationale du jour Mr. Higgins conjures in defense of his department's ongoing practice.

1.    **Facts**

    1.1.    **The plaintiffs join sign-holding protests on Connecticut overpasses.**

Early this year, plaintiff Erin Quinn became alarmed by what she views as the federal government's newfound contempt for the rule of law. She began thinking about how to voice her concern to her community, eventually meeting a group of people who informally came together to peacefully hold signs on interstate overpasses to the passing traffic. The group called itself the Visibility Brigade. Their signs, containing different messages, were either homemade letters on black Posterboard, used to spell out messages, or vinyl banners. Ms. Quinn decided to join them.

From March 2025 to July 2025, Ms. Quinn joined about 20 protests, mainly in West Haven, organizing her schedule around her kids' school drop-off and pick-up. She has held posterboards, and also helped hold poles attached to larger banners. For Ms. Quinn, showing her face with the signs demonstrates to people living in her part of Southern Connecticut that "regular people who live right here" care about the rule of law.  She believes that signs alone fail to convey her important message on a human level: "A poster or billboard could be paid for by who knows what organization, but when I'm holding my signs, you can see that it's a real human behind it."

Plaintiff Robert "Bob" Marra is tree pathologist who works as a research scientist. Dr. Marra has become similarly alarmed by the behavior of the current executive branch, and hoped to do something tangible to show his disagreement with the direction of the country. In late January or early February, Dr. Marra learned of the Visibility Brigade, and decided to join them.

Dr. Marra attended his first sign-holding session in late February and has since joined the sign-holding protests on a weekly basis. He typically stands and waves while others hold signs, although he has helped hold poles to which larger banners are attached. At times, Dr. Marra also holds up the Ukrainian flag to show his support for that country. Like Ms. Quinn, Dr. Marra believes that human connection is a key part of his speech and that it is critical to show his face along with his sign.  As a Southern Connecticut resident, he finds I-95 to be a sort of main street for that part of the state. For Mr. Quinn, the volume of the vehicles that pass by while he is holding his sign is unbeatable in terms of visibility and getting his message across to different groups.

Ms. Quinn and Dr. Marra have joined sign-holding protests in New Haven, Branford, and West Haven, although they are aware that similar groups are showing up

to hold signs in other parts of the state. Between them, the two have attended approximately 50 sign-holding protests on overpasses. Before state troopers started detaining, citing, and arresting sign-holders, both Ms. Quinn and Dr. Marra planned to continue joining the sign-holding protests for as long as they took place.

### 1.2.    The defendant, and his statutory authority.

Defendant Ronnell Higgins is commissioner of Connecticut's Department of Emergency Services and Public Protection, which includes the state police.  The state police have statewide criminal and motor vehicle law enforcement authority.  Conn. Gen. Stat. § 29-7.  As commissioner, Mr. Higgins has "general jurisdiction of the affairs of the Division of State Police," may "prescribe rules for the government of the division," Conn. Gen. Stat. § 29-2, and may therefore enforce compliance with an injunction from this Court.

### 1.3.    Connecticut's state highway system, and use of overpasses spanning state highways.

Connecticut's Department of Transportation constructs and maintains a highway system linking various points in the state.  Conn. Gen. Stat. § 13a-14.  That system includes the roads commonly referred to as "interstates."  Conn. Gen. Stat. § 13a-15.[1]  Aany portion of a road passing over a state highway is, by law, "state highway property," with an automatic easement to the municipality for travel, if the traversing road is a municipal one.  Conn. Gen. Stat. § 13a-99a(a).

---

[1] Federal and Connecticut law sometimes use the more formal title, "the National System of Interstate and Defense Highways," but the names are interchangeable. Conn. Gen. Stat. § 13a-15.

Limited access highways are a subset of state highways.  They are specifically designated state highways that can be entered and exited "only at highway intersections or at designated points."  Conn. Gen. Stat. § 13b-27.  Entering a limited access highway at a point other than one of the designated entrances is a finable infraction, Conn. Gen. Stat. § 14-238a, as is use of a limited access highway by a pedestrian in contravention to the posted prohibition. Conn. Gen. Stat. § 53-182.  The Deparment of Transportation publishes a list of all limited access highways annually. Conn. Gen. Stat. § 14-298.[2]

Overpasses spanning limited access highways are not necessarily limited access highways themselves.  For example, Woodward Avenue in New Haven is a city street with sidewalks on both sides as it passes over I-95.  Like Woodward Avenue itself,[3] the overpass portion of Woodward Avenue is also not a limited access highway, and so pedestrians and bicyclists are free to use it.  By contrast, the overpass by which Interstate 84 traverses Interstate 91 in Hartford is a continuous part of I-84, and the overpass itself is therefore a limited access highway.

But limited access highways are a very narrow exception to Connecticut's otherwise-permissive view of pedestrian road use. Ultimately, pedestrians are allowed on all roads other than limited access ones.  Where a road has "a sidewalk adjacent to such roadway is provided and the use thereof is practicable," a pedestrian must walk on the sidewalk.  Conn. Gen. Stat. § 14-300c(a).  Where there is no sidewalk or using it is impracticable, a pedestrian may walk "on the shoulder [of the road] and as far as practicable from the edge of such roadway."  *Id*.  And where there is neither a sidewalk nor shoulder, a pedestrian may "walk as near as practicable to an outside edge of such

---

[2] The most recent list that Transportation Commissioner Garrett Eucalitto has published is at ECF # 1-3.
[3] *See id.*

roadway." *Id.*  The only thing pedestrians may *not* do is enter the traveled portion of a road negligently or recklessly, which is a fineable offense.  Conn. Gen. Stat. § 53-182.

### 1.4.    Connecticut's sign regulation scheme.

Connecticut's highway sign-permitting scheme forbids the "*erection of outdoor advertising . . . signs . . . within six hundred sixty feet of the edge of the right-of-way, the advertising message of which is visible from the main traveled way of any portion of*" an interstate.  Conn. Gen. Stat. § 13a-123(a)(1) (emphasis added).  The state similarly forbids displays farther than 660 feet from the edge of the right-of-way that are "located outside of urban areas, visible from the main traveled way of the system and erected with the purpose of their message being read from such main traveled way."  *Id.* The permitting statute gives exclusive enforcement of its terms to the Commissioner of Transportation, not to Defendant Higgins or his employees.  *Id.* § 13a-123(j), (k).

The permitting statute is broadly interpreted by its implementing regulations, which define § 13a-123's use of the word 'sign' to include "any outdoor sign, display, . . . message . . . poster . . . which is designed, intended or used to advertise or inform."  Conn. Agencies Regs. 13a-123-2(h).  The regulations define 'erect' as meaning "to construct, build, raise, assemble, place, affix, attach, create, paint, draw, or in any other way bring into being or establish . . . ."  Conn. Agencies Regs. 13a-123-2(b).

An interlocking statute controls the content, rather than the placement, of signs within 300 feet of any state highway.  That statute—titled "unauthorized signs"—forbids signs using the words "'[s]top,' 'caution,' 'danger,' 'dangerous,' 'warning,' or 'slow.'" Conn. Gen. Stat. § 13a-124.  It also bars "any . . . word or character or any . . . symbol intended to give or capable of . . . interfering with traffic."  *Id.*  But it exempts certain

favored messages, such as signs pointing traffic to "agricultural tourism" sites, places where Connecticut-made beer is made or sold, and any farm within ten miles where Connecticut-made wine is made or sold.  *Id.*  Any non-conforming sign may nonetheless be erected with the "approval or under the direction of the commissioner" of transportation, *id.*, who takes the position that no overpass sign of the kind held by Ms. Quinn or Dr. Marra triggers § 13a-124.  ECF # 30-2.

Interpretation and enforcement of the relevant sign permitting schemes has been inconsistent, confirming that the amorphous discretion that Defendant Higgins continues to vest in his employees is just an invitation to inflict one-off judgments that are ignorant of the First Amendment.  For example, protesters have displayed—or even affixed—signs to overpasses without incident. During President Obama's tenure, protesters dissatisfied with the federal government's actions erected signs along the Howard Avenue overpass in New Haven, one of the same locations visited by Dr. Marra and his sign-holder colleagues in recent months. As photographed and reported by the New Haven Register in 2013, the protesters attached signs to the fencing along the overpass while waving to traffic below.[4]

---

[4] New Haven Register, *Anti-Obama Protesters Rally on New Haven I-95 Overpass* (Aug. 30, 2013), https://www.nhregister.com/connecticut/article/Anti-Obama-protesters-rally-on-New-Haven-I-95-11410723.php.



By contrast, Ms. Quinn and Dr. Marra have engaged in similar protest actions to wildly different results.[5]

Meanwhile, American flags are frequently put up on Connecticut overpasses, without apparent repercussions. Overpasses are also used by demonstrators displaying solidarity with a public employee who has died on the job. In 2021, for example,

---

[5] This photograph is an example of a banner held at one of the Visibility Brigade demonstrations.

firefighters stood on overpasses from New Haven to Hartford to honor a colleague, alongside large flags mounted to their rigs.[6]



Although one of the state statutes threatened against Ms. Quinn and Dr. Marra—and cited in the prosecutions of some of their fellow protesters—forbids signs with "capable of . . . interfering with traffic," or containing the word "[s]top," Conn. Gen. Stat. § 13a-124, Defendant Higgins has not threatened or prosecuted a law firm whose electronic billboard on I-91 implores motorists with the forbidden word:

---

[6] *See, e.g.*, WTNH, *Firefighters Line overpasses on I-91 from New Haven to Hartford to honor fallen firefighter Ricardo Torres Jr.*, (May 20, 2021), https://www.wtnh.com/news/connecticut/firefighters-line-overpasses-on-i-91-from-new-haven-to-hartford-to-honor-fallen-firefighter-ricardo-torres-jr/.



Nor has he prosecuted advertisers displaying large billboards intentionally designed to attract drivers' attention, like this one on I-95 north in Fairfield County:



Nor has he forced the removal of billboard structures close to elevated highways within Connecticut's cities, which place very large advertising at motorists' eye level, as does this example from I-95 south in Bridgeport:



Nor has he taken any action against a Connecticut law firm's notable sequences of billboards, which spread out a short sentence over three billboards to create a message for motorists to follow as they drive I-91:



### 1.5.  The state police begin interrupting overpass speech, and cause Ms. Quinn and Dr. Marra to fear prosecution.

When they began their sign-holding protests, Ms. Quinn and Dr. Marra and other sign-holders were able to peacefully come, hold signs for several hours, and

leave without incident. Beginning in February 2025, however, state police employees began detaining sign-holders standing on I-95 overpass sidewalks.

One of the first instances of this occurred in mid-February, when one of Defendant Higgins's employees, Joshua Jackson, stopped a group lawfully standing on the Cherry Hill Road overpass in Branford. Cherry Hill Road is a quiet municipal road that is not a limited access highway.[7]  No barriers prevent pedestrians from walking on the portion of Cherry Hill Road that crosses above I-95, and no signs forbade them from doing so.  Yet Jackson claimed that "it is unlawful to . . . display any type of sign, in any way, to (sic) any property owned by [the Department of Transportation] including overpasses."[8]  He also claimed that "it is unlawful to create distraction for . . . traffic that results in a public disturbance . . . in the form of traffic congestion,"[9] and told the group that *any* sign would distract motorists.

A similar incident occurred in April, when several of Defendant Higgins's employees again stopped a group of sign-holders on Cherry Hill Road. This time, the troopers told the sign-holders that it was "unlawful" to "display any type of sign" on an overpass,[10] and again claiming that a person incurs criminal liability for creating traffic congestion.[11]

On the morning of Monday, May 19, Jackson again detained sign-holders, including Ms. Quinn and Dr. Marra, this time on Howard Avenue in New Haven. Howard Avenue is a broad residential street that has sidewalks on both sides and is not

---

[7] Connecticut Dep't of Transportation, *2025 Limited Access State Numbered Highways* (Dec. 31, 2024) [ECF # 1-3].
[8] Information and Arrest Warrant App., *State v. Hinds*, No. N23N-CR25-0261993-S, at 5 (Conn. Super. Ct. Aug. 6, 2025) [ECF # 1-4].
[9] *Id.*
[10] *Id.*
[11] *Id.* at 6.

a limited access highway.  The portion of Howard Avenue crossing above I-95 has no barriers or signs barring pedestrians from using its sidewalks.

The group stood on the portion of Howard Avenue that passes over I-95.  They displayed signs of varying sizes to passing motorists. Some in the group had again bungee-corded posterboards to the inside of the chain-link fencing lining the portion of Howard Avenue above the interstate.  Jackson, appearing irate, tore down the signs on the fence, but did not limit his allegations of illegality to bungee cords.  According to Jackson, the protesters were "trespassing" because all overpasses are "private property" of the State; *any* display of signs was illegal; and the protesters would be responsible if any drivers were distracted and got into an accident.

Jackson then demanded everyone's identification for the purpose of checking for outstanding warrants.  Some of the people on the sidewalk gently declined to produce identification and expressed surprise that Jackson would check warrants for grey-haired retirees.  After discussion with a colleague, Jackson announced that he had received "an emergency call" requiring him to move on. Both Ms. Quinn and Dr. Marra were shaken by this encounter, though they continued to protest (Ms. Quinn less than before).

Finally, on a Saturday morning in July, Dr. Marra and a group of others stood on Stevens Avenue in West Haven, where that street passes over Interstate 95.  Stevens Avenue is a short municipal street, and not a limited access highway.[12]  The portion of Stevens on which the plaintiffs stood has a sidewalk, and they stood on it.  The plaintiffs and the others on the sidewalk held up signs to the traffic below on I-95. They did not attach anything to the overpass structure.

---

[12] Connecticut Dep't of Transportation, *2025 Limited Access State Numbered Highways* (Dec. 31, 2024) [ECF # 1-3].

The West Haven police appeared, explaining that the state police asked them to break up the demonstration.  Eventually, two state police employees arrived and asked the group to stop displaying their signs.  Dr. Marra did not believe that the state police order comported with the First Amendment.  But it was obvious to him that the lawfulness of his speech "was not going to be resolved" on a sidewalk with line-level cops.

Dr. Mara was correct. Statements of Defendant Higgins and his employees are alarmingly contrary to the First Amendment's Speech Clause, since they appear to *de facto* hold speakers responsible for listeners' reactions.  Defendant Higgins's employee, Joshua Jackson, averred that an overpass speaker "create[s] a distraction for vehicular interstate highway traffic" when the speech "results in . . . traffic congestion or otherwise."[13]  Higgins himself, in brushing off two legislators' inquiry into the overpass speech ban, identified the harms he is trying to combat as "distracting motorists,"[14] indicating that he shares his employee's view that a speaker may be held responsible for a listener's reaction, and, that a speaker's criminal liability can vary with the contents of their speech: the more 'distraction' it causes any listener, the more culpable the speaker.

On July 19, Defendant Higgins significantly ratcheted up the threats against peaceful overpass protesters like Ms. Quinn and Dr. Marra.  On that day, one of his employees arrested Katherine Hinds, a seventy-one year-old retiree, for displaying signs from an overpass sidewalk above I-95 in Fairfield County.  Higgins's employee charged Ms. Hinds with breach of peace, trespass—purportedly because the state police had verbally barred her from displaying signs from overpasses on an earlier occasion, and

---

[13] Information and Arrest Warrant App. 6, *State v. Hinds*.
[14] Letter from Ronnell Higgins to Sen. Bob Duff and Rep. Anne Hughes [ECF # 1-6] at 2 (Aug. 19, 2025).

violating the 'unauthorized signs' statute, Conn. Gen. Stat. § 13a-124 (barring signs "capable of . . . interfering with traffic").

But his employees weren't done. On August 8, the state police arrested Ms. Hinds at her home, pounding on her door at 6:00 a.m. in a "show of force" that her counsel described as only necessary when "taking down a gang or drug related operation," when the arrestee is "a dangerous target."[15] The state police had combed Ms. Hinds's social media and obtained an arrest warrant for her prior protest activity, alleging in relevant part that it is illegal to display *any* sign from an overpass sidewalk.[16] The police used the dawn apprehension of Ms. Hinds in her pajamas to charge her with breach of peace (purportedly for causing traffic *on I-95*), trespass, and violating the unauthorized sign statute.

Defendant Higgins continued his prosecution of peaceful speakers a week later. On August 14, his employees ticketed seven people displaying signs from an overpass spanning the Merritt Parkway, in Fairfield. Once again, the state police charged the protesters with violating the unauthorized sign statute, § 13a-124.

Both Ms. Quinn and Dr. Marra know Ms. Hinds and quickly learned of her arrests. They also found about the citation of the Merritt overpass protesters.[17]

For both Ms. Quinn and Dr. Marra, the arrests confirmed that they could no longer protest on overpasses. Ms. Quinn had already been shaken by her May encounter

---

[15] Stephen Underwood, *A 71-year-old CT Activist has Been Arrested Twice by State Police. Her Lawyers Allege Retribution*, Hartford Courant, https://www.courant.com/2025/08/20/a-71-year-old-ct-activist-has-been-arrested-twice-by-state-police-her-lawyers-allege-retribution (Aug. 20, 2025).
[16] Information and Arrest Warrant App. 5, *State v. Hinds*.
[17] Subsequently, the prosecutions initiated by Higgins's employees against Katherine Hinds both ended, when one was dismissed by the Connecticut Superior Court in Milford, and the other concluded when prosecutors entered a nolle prosequi in the Connecticut Superior Court in New Haven. Meanwhile, the seven prosecutions of the Merritt overpass sign-holders in the Connecticut Superior Court at Bridgeport were terminated when state prosecutors entered *nolle prosequis* in each case.

with state police. As the primary caretaker of two children, she feels she can no longer tolerate the risk of being harassed or potentially arrested by police for her protest activities. For Dr. Marra, similarly, the pattern of disruption, the other protester prosecutions, and the "fluid reasoning" in the state police's cited authority for forbidding speech left no doubt in his mind that arrest was a substantial possibility if he continued to demonstrate. The arrest of Katherine Hinds was the final straw. He decided to stop holding signs on overpasses until this Court rules.

Subsequent events have only reinforced the plaintiffs' reasoning.

In September, Defendant Higgins issued his employees a memorandum purporting to give them guidance on overpass speech. The Higgins memo did not, however, set forth any meaningful limits on state police employees' practice of interrupting overpass speech. And the memo does little to assuage Ms. Quinn and Dr. Marra's fears of detention or prosecution for their speech. Higgins told his employees that "[t]he Department of Transportation's regulations prohibit unauthorized signs on State highways, which includes any signage affixed to a structure such as the fence on a highway overpass," citing Conn. Agencies Regs. § 13b-17-19.[18] Higgins did not convey that the cited regulation has no offense within it that may be enforced by Connecticut criminal procedure. Higgins then told his employees that an "immediate concern with such signs is the danger they create by . . . distracting motorists," thus reinforcing the practice of holding speakers accountable for reactions of the listener.

The memo also misleadingly conflates sign display with sign attachment—a practice the plaintiffs do not challenge here. Higgins instructed his employees that "[a]

---

[18] ECF # 22-3 at 2.

single sign or the American flag on an overpass fence might not create a significant risk while multiple large and bulky signs might require action," but failed to explain that displaying a sign without attaching it to the overpass fencing yields no regulatory violation, even if the state police were authorized to enforce purely regulatory violations, which they are not.

The Higgins memo further suggested that grounds for restricting overpass speech lie in the reaction of drivers, telling them that "protests around the highway may cause traffic to slow and, therefore, could be associated with a motor vehicle accident." Higgins also drew his employees' attention to the fact that "several recent overpass protests have caused drivers to call 911 to report dangerous conditions on the highway below," suggesting that 911 calls have bearing on whether sign-holding merits interruption.

Most importantly, Higgins's memo predictably failed to stop the state police's unlawful practice. Ten days after its issuance, and during the pendency of this litigation, a state police employee interrupted speech on the Stevens Avenue overpass in West Haven. A group of Visibility Brigade members gathered on that overpass that morning and peaceably displayed signs to traffic. There were "fewer than six" Brigadiers "on both sides of" Stevens Avenue. Ms. Quinn was too afraid to attend the protest, so instead drove by and honked.

Taking his cue from Higgins's memo, the police employee who showed up insisted that the Brigadiers were "blocking the sidewalk." He told the Brigadiers that, because their signs were visible to traffic on I-95, the protesters were committing the crime of breaching the peace. He also told them that their sign-holding violated the Department of Transportation's sign regulation statute, § 13a-123.

While they are unable to hold signs, the plaintiffs are entirely unable to reach their intended audience of interstate drivers.  Regulations freely permit up to 900 square foot electronic billboards to dominate the viewshed of Connecticut interstates, even as they forbid Dr. Marra and Ms. Quinn from holding small signs. But renting billboard space for their messages is not an option for the plaintiffs. According to an outdoor advertising industry executive, space on Connecticut's interstates ranges from "$400 to $1,700 per week billed on a 4-week period."[19]  The price varies by "the [a]verage [d]aily [t]raffic, the demography of the traffic ([a]ge and income of the passengers), the geographic reach of the traffic (where the vehicular trips originate and terminate) and the frequency that the traffic passes the location in a week."[20]

## 2.    The preliminary injunction standard.

A preliminary injunction is warranted where the moving party demonstrates (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, and (3) that an injunction is in the public interest.  *E.g.*, *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).  Here, Ms. Quinn and Dr. Marra seek a prohibitory injunction, because their request that Defendant Higgins stops his department's speech-interruption practice preserves "the last actual, peaceable uncontested status which preceded [this] controversy": their speech before the state police began threatening them for it.  *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (cleaned up).

---

[19] Decl. John Barrett [ECF # 1-5] ¶ e.
[20] *Id.*

3.    **The defendant's overpass speech ban is unconstitutional whether framed as one barring some signs, or as one barring all signs, and so Dr. Marra and Ms. Quinn will succeed on the merits of their claim.**

There is no question that overpass streets and sidewalks are traditional public fora that merit the highest levels of First Amendment protection.  To save his department's practice of stopping overpass speech, Defendant Higgins must therefore prove the constitutionality of the practice as either a selective ban (content-based), or as a total ban (content-neutral). Either way, he loses.

Content-based bans receive strict scrutiny. A selective overpass speech ban fails strict scrutiny because it gauges a message's legality by a listener's reaction, and, is not the least-restrictive means of preventing distracted driving.

Content-neutral bans receive intermediate scrutiny.  Here, a total ban fails intermediate scrutiny for its lack of narrow tailoring and ample alternative channels through which the plaintiffs may reach interstate drivers.

Because Defendant Higgins cannot justify the State Police's overpass speech regulation no matter which way he casts it, the plaintiffs can demonstrate the requisite likelihood of success on the merits for a preliminary injunction.

### 3.1.    Overpass streets and sidewalks are public fora.

Ms. Quinn and Dr. Marra seek to continue speaking from overpass streets and sidewalks.  Those locations receive the highest level of First Amendment protection, undiminished by whatever restrictions may apply to the highways they pass over.

"[T]he level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs." *Peck ex rel. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005), creating a sliding scale

from most-protected to least.  At the top of the scale lie traditional public fora, where the ability of a state to limit expression is "sharply circumscribed." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

Streets and sidewalks are traditional public fora. From the colonial era onward, they have "been used for . . . communicating thoughts between citizens," *Boos v. Barry*, 485 U.S. 312, 318 (1988) (cleaned up).  No sidewalk-by-sidewalk analysis is required or appropriate; instead, "all public streets are held in the public trust and are properly considered traditional public fora." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988).  *See id.* at 480 (explaining that the public forum conclusion "follow[s] automatically" from the location being a public street or sidewalk).

The overpass sidewalks are a part of the municipal street network, and are not separated in any way so as, for example, to end the street network and reserve the overpass for a different use.  Their proximity to an interstate cannot alter the conclusion.  Just as a city street does not become a limited access highway merely by running above one, a street or sidewalk does not shed its status as a public forum when it runs next to, or above, an area that is not one.  "[A] public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood." *Id.* at 480.  The same goes if it runs above a state highway.  "Traditional public forum property . . . will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *United States v. Grace*, 461 U.S. 171, 180 (1983) (striking statute barring the display of signs or banners on the Supreme Court grounds, as applied to sidewalks on those grounds connected to and "indistinguishable from any other sidewalks in Washington, D.C.").

Short of physically cutting Connecticut overpasses off completely from the local street network, Defendant Higgins is stuck with the public forum conclusion. He may not, for example, just eviscerate sidewalks' status by fiat or legislation, as might be possible with lesser-protected forums. *Id.*

Nor may he jettison a sidewalk's public forum status by issuing move-on orders and threatening (or charging) trespass if the person returns. First, doing so violates the Speech Clause. *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) (holding that protests may not be shut down absent the "clear and present danger" of an "immediate threat to public safety, peace, or order"); *see also Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (explaining that *Cantwell* means that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest"). Second, such orders violate the Due Process Clause. *E.g.*, *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965) (striking for-any-reason move-on ordinance because it subjects the right to be on a public sidewalk to "the whim of any police officer"); *City of Chicago v. Morales*, 527 U.S. 41, 65 (1999) (striking same type of ordinance for same reason). *Cf. Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969) (Black & Douglas, JJ., concurring) ("To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws.").

The streets and sidewalks at issue here are immutably public fora. *E.g.*, *Picard v. Magliano*, 42 F.4th 89, 102 (2d Cir. 2022). Defendant Higgins is therefore obligated to prove the constitutionality of his department's speech-interruption practice. *E.g.*, *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022).

### 3.2. A selective overpass speech ban fails strict scrutiny, and a total ban fails intermediate scrutiny.

Defendant Higgins has primarily attempted to justify his speech ban by suggesting that only some speech is restricted (a content-based ban).[21] Thus, he must satisfy strict scrutiny, showing that his ban is "necessary to serve a compelling state interest," *Perry*, 460 U.S. at 45, and "the least restrictive means to achieve its ends." *Evergreen Ass'n v. New York City*, 740 F.3d 233, 246 (2d Cir. 2014). But speech bans that vary with a listener's reaction to the speech are flatly unconstitutional, and regardless, a content-dependent overpass speech ban is not the least-restrictive means of preventing road crashes, and so the ban is unconstitutional.

In the alternative, if Defendant Higgins claims that his speech ban is content-neutral (*i.e.*, § 13a-124 alone or in combination with any other source of law bars *all* overpass speech), then he must satisfy intermediate scrutiny, by showing that a total overpass speech ban is narrowly tailored and leaves the plaintiffs alternative channels to reach interstate drivers. He cannot do this, either: Plaintiffs have no alternative channel, and Connecticut law simultaneously admits exceptions allowing the very harm they claim to remedy through a total speech ban.

### 3.2.1. An overpass speech ban applicable only to certain messages depending on drivers' reactions to them is not narrowly tailored, and is not the least-restrictive means of maintaining motorists' duty to drive safely.

Thus far, the defendant suggested that his speech ban applies only to certain speech, either because of the words used or its alleged traffic-generating

---

[21] For example, Defendant Higgins's bulletin relies upon a DOT regulation barring signs of certain contents. Higgins Dec. [ECF # 24-1] 18, *citing* Conn. Agencies Reg. § 13b-17-19.

effects.  This is a quintessential content-based speech restriction: one that "applies to particular speech because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 576 U.S. 155, 155 (2015).

The 'unauthorized sign' statute that Defendant Higgins's employees have used and threatened is a straightforward content-based restriction.  First, most of its scope depends on the contents of the sign.  It overtly bars signs containing the words "'[s]top,' 'caution,' 'danger,' 'dangerous,' 'warning,' or 'slow.'"  Conn. Gen. Stat. § 13a-124.  It exempts certain favored messages, including: "directional sign[s]" pointing motorists to "farming that is part of the state's agricultural tourism," "facilities . . . where Connecticut-made beer is manufactured or sold, including, but not limited to, signs or notices containing the words 'Connecticut Brewery Trail'," and "any farm" within ten miles "where Connecticut-made wine is manufactured or sold, including, but not limited to, signs or notices containing the words 'Connecticut Wine Trail.'"  *Id.*  And, it contains an amorphous catch-all allowing signs otherwise violating the statute so long as they are displayed "with the approval or under the direction of the commissioner."  *Id.*

Second, one of the statute's prohibitions—the very one threatened against the plaintiffs and actually charged against Katherine Hinds—is determined by a listener's reaction to speech.  The statute bars signs bearing "any . . . word or character or any . . . symbol intended to give or capable of . . . interfering with traffic."  *Id.*  Defendant Higgins and his employees take the view that signs violate the interference-with-traffic portion of § 13a-124 when they "distract[] motorists,"[22] or create a traffic "slow-down"[23] or "congestion."[24]  But applying § 13a-124 to a sign-holder based upon the actions of

---

[22] Higgins letter 2.
[23] *Id.*
[24] Information and Arrest Warrant App. 3, *State v. Hinds.*

passing motorists is pure content-based selection amongst expression. The milquetoast or inscrutable message may draw no reaction whatever from passing motorists and so create no "slow-down" or "congestion," while a funny or widely popular message may prompt something else. And hence, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135 (1992) (striking municipal permitting scheme charging sliding-scale fee based on how police thought crowd would react to permittee). Defendant Higgins therefore bears the burden of satisfying strict scrutiny here.

Doing so is impossible, because a content-based restriction is presumptively invalid. *E.g.*, *Friend v. Gasparino*, 61 F.4th 77, 91 (2d Cir. 2023). Under strict scrutiny, the restriction can only be saved if its proponent proves that it is "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. Narrow tailoring for strict scrutiny purposes is an exceedingly difficult threshold, because it requires the proponent of a speech ban to prove that it has used "the least restrictive means to achieve its ends." *Evergreen Ass'n*, 740 F.3d at 246. When a less restrictive alternative exists, the ban fails. *E.g.*, *Reno v. ACLU*, 521 U.S. 844, 874 (1997); *Sable Commc'ns of Cal. v. F.C.C.*, 492 U.S. 115, 126 (1989); *Landell v. Sorrell*, 382 F.3d 91, 126 (2d Cir. 2004), *rev'd and remanded on other grounds sub. nom. Randall v. Sorrell*, 548 U.S. 230, 236 (2006).

### 3.2.1.1. Punishing a speaker for the acts of a listener over whom they have no control is not a narrowly tailored means of deterring or punishing bad acts by the listener.

Whether the defendant justifies the speech ban as the product of § 13a-124, a criminal statute like breach of peace, or some combination thereof, he will run aground.  The Speech Clause bars the government from shifting responsibility for a listener's reaction to the speaker.

"The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," and so punishing a person's speech "in order to deter conduct by a non-law-abiding third party" is "quite remarkable" for its ill fit to the deterrence goal.  *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) (barring application of wiretap statute's civil liability provision to innocent third party who publicized the wiretapped conversation but had no role in obtaining it).  Were that not the rule, speakers would become responsible for listeners, and censor themselves out of fear that a listener's illegality be imputed to them.  Seminal civil rights and worker's rights cases completely foreclose that arrangement, and so bar Defendant Higgins from applying the unauthorized sign, disorderly conduct, or breach of peace statutes to the plaintiffs here.  *See Cox v. Louisiana*, 379 U.S. 536, 551 (1965) (reversing breach of peace conviction on First Amendment grounds because the statutory language permitted conviction for "agitat[ing]" or "disquiet[ing]" others, a scope so far broader than preventing imminent violence as to "allow persons to be punished merely for peacefully expressing unpopular views"); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963) (same where broad statutory violation founded on nothing more "than that the opinions which . . . were peaceably express[ed] were sufficiently opposed to the views of

the majority of the community to attract a crowd and necessitate police protection”); *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940) (“[T]he group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests.”).

Connecticut courts have accounted for this rule by narrowing breach of peace or disorderly conduct statutes whose text sweeps in speech, and therefore poses a risk of First Amendment violations.  By limiting interpretation, such statutes apply only where a speaker incites imminent violence by intentionally using fighting words, or acts with the intent to disrupt or disturb others rather than exercise a constitutional right.  *See State v. Baccala*, 163 A.3d 1, 4 (Conn. 2017) (noting that “[t]he broad language of Connecticut’s breach of peace statute” has been limited to “those words that have a direct tendency to cause acts of violence”) (internal quotation omitted); *State v. Parnoff*, 186 A.3d 640, 646 (Conn. 2018) (reversing the defendant’s conviction for disorderly conduct because his speech was unlikely to “provoke an imminent violent reaction”) (internal quotation omitted); *State v. Indrisano*, 640 A.2d 986, 994 (Conn. 1994) (clarifying that “in order to support a conviction for disorderly conduct, the defendant’s predominant intent must be to cause inconvenience, annoyance or alarm, rather than to exercise his constitutional rights”).  Requiring the speaker to *intend* the disruption avoids the very Speech Clause violation that Defendant Higgins continues to foster: punishing a speaker for a driver’s inability to follow the rules of the road, or for police service calls generated by objections to the speaker’s message.  ECF # 24-1 at 19.  And it is likely the prime reason that every charge brought by Defendant Higgins’s employees

against a peaceable overpass protester since January has been deep-sixed by state prosecutors or judges.

### 3.2.1.2.    Diligent enforcement of Connecticut's traffic and criminal codes are less-speech-restrictive means of combatting distracted driving.

The second strict scrutiny tailoring wall that the Defendant Higgins collides with is the least restrictive means rule.  That rule notably does not ask whether a speech restriction "has some additional ability to achieve" a governmental interest, as "[a]ny restriction on speech could be justified under that analysis."  *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).  Instead, it asks whether the restriction "is the least restrictive means among available, effective alternatives."  *Id.* And so, the defendant may not salvage a selective overpass speech ban on the grounds that it has some non-zero effect on distracted driving.  Instead, he must justify the ban as against other methods of punishing and deterring drivers from failing to pay attention to the road.

He cannot do so. Connecticut has a full range of civil and criminal statutes barring drivers from failing in their duty to drive safely, and, barring protesters from intentionally interrupting interstate traffic.  Those statutes' existence forecloses the defendant from restricting speech in the interest of combatting those harms.  *See, e.g., United States v. Alvarez*, 567 U.S. 709, 729 (2012) (striking federal statute penalizing false claims about receipt of military medals where there existed "at least one less speech-restrictive means by which the Government could likely protect the integrity of the military awards system," *i.e.*, establishing a public database listing Medal of Honor recipients); *Ashcroft*, 542 U.S. at 668 (affirming preliminary injunction against internet

content restrictions where government failed to show that alternatives like parental control filters would not suffice); *Reno v. ACLU*, 521 U.S. 844, 878-79 (1997) (striking federal statute barring "indecent" and "patently offensive" material from the internet where government failed to show that parental controls would not suffice).

### 3.2.2. A total overpass speech ban is unconstitutional for lack of narrow tailoring.

Alternatively, Defendant Higgins might claim that his overpass speech ban is a content-neutral one, because it forbids the display of "*any* type of sign, in *any way*, to (sic) any property owned by [the Department of Transportation] including overpasses."[25]  Content-neutral sidewalk speech restrictions—sometimes shorthanded as 'time, place and manner' ones—are those that do not choose among messages, but require all expression to shift location, medium, or hour in a way "largely immaterial to the exercise of the right." *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 73 (2d Cir. 2025).  Content-neutral sidewalk speech restrictions must be stricken unless they "serve a significant government interest," are "narrowly tailored" to accomplish that interest, and "leave open ample alternative channels of communication." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (cleaned up).

Here, Defendant Higgins's first fatal tailoring problem[26] is that his department does not silence other signs within the interstate viewshed, most quite large.  The

---

[25]  Information and Arrest Warrant App. 3, *State v. Hinds.*
[26] The narrow tailoring inquiry applicable to a content-neutral speech restriction is less exacting than the one applicable to a content-based one, and so any tailoring deficiency sufficient to defeat a content-neutral speech ban necessarily defeats a content-based one as well.

statutory exceptions allowing for those other signs mean that he cannot forbid speech by overpass pedestrians.

To start with, Connecticut's sign-permitting statute sets out a blanket prohibition against all signage (1) in urban areas, within 660 feet of the highway right of way's edge, and (2) in rural areas, at any distance at all provided that the sign can be seen from the traveled portion of the highway. Conn. Gen. Stat. § 13a-123(a)(1). But it then opens exceptions for billboards that any regular traveler of Connecticut interstates will recognize as swallowing the rule. Conn. Gen. Stat. § 13a-123(f).[27] As with all other permitted signs, such electronic billboards may be up to 900 square feet large, so long as the advertising space is no more than either twenty-five feet high or sixty feet long. Conn. Agencies Regs. § 13a-123-13(c).

Large electronic billboards are not where the exceptions stop, however. The statute also sets out loopholes for "signs, displays or advertising devices" that are "in place for sixty days or less," Conn. Gen. Stat. § 13a-123(e)(4), "within areas owned, leased or managed by a public authority" for certain land uses including "airport development zones," id. § 13a-123(e)(5)(A), and "upon . . . structures . . . in the custody or control of the state and designed, operated or intended to be operated for the purpose of presenting athletic, artistic, musical or other entertainment events." Id. § 13a-123(e)(5)(B). And, the statute expressly allows vehicle-mounted advertising: Nothing in

---

[27] The statute reads: Notwithstanding the provisions . . . of this section, signage that may be changed at intervals by electronic or mechanical process or by remote control shall be permitted within six hundred sixty feet of the edge of the right-of-way . . . , except as prohibited by state statute, local ordinance or zoning regulation, provided such signage
(1) has a static display lasting no less than eight seconds,
(2) achieves a message change with all moving parts or illumination moving or changing simultaneously over a period of three seconds or less, and
(3) does not display any illumination that moves, appears to move or changes in intensity during the static display period.

the permitting statute "shall prohibit the erection or maintenance of . . . signs upon . . . personal property . . . ."  Conn. Gen. Stat. § 13a-123(a)(3).

The overt permission for 900-square-foot electronic signs, and for vehicle-mounted ones, renders any part of the sidewalk speech ban resting on the § 13a-123 sign-permitting statute fatally underinclusive.  If Defendant Higgins is concerned about driver distraction, a speech restriction reaching so little of the purportedly problematic conduct—900 square foot signs ok, three square foot signs not—does not advance his purported interest.  *See*, *e.g.*, *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 104-05 (1979) (statute barring newspapers, but not electronic media, from publishing names of juvenile proceeding respondents "does not accomplish its stated purpose" of protecting those names).

And, taking no issue with signs ten times as large as Ms. Quinn's or Dr. Marra's raises the specter that Defendant Higgins is not so concerned with driver distraction so much as impeding certain speech.  "[W]here the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive."  *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004) (footnote omitted).  The defendant's sidewalk speech ban "regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015) (emphasis in original), and thus cannot be constitutional.

Defendant Higgins's second narrow tailoring problem under a content-neutral ban scenario is proving "that alternative measures that burden substantially less speech

would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).  But Defendant Higgins has indeed taken the easier route. Like Massachusetts in *McCullen*, he has skipped over non-speech-restrictive tools at his disposal to control the behavior of protesters.  *See id.* at 492 (chastising Massachusetts for creating speech buffer zones instead of looking first to local ordinances barring the obstruction of sidewalks, the state's "criminal statutes forbidding assault, breach of the peace . . . and the like," and civil remedies).  *See also Cornelio v. Connecticut*, 32 F.4th 160, 174 (2d Cir. 2022) (holding that "the government must explain why criminal sanctions that do not implicate the First Amendment would not provide adequate deterrence" to survive the content-neutral narrow tailoring inquiry).

 *McCullen*'s narrow tailoring analysis is similar to lower court decisions on streetside solicitation bans.  In *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011), the Ninth Circuit held that a municipal ordinance barring roadside solicitation failed content-neutral narrow tailoring because the municipality's claimed interest in preventing traffic accidents or solicitors in the roadway could easily be met by "other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *Id*.  Our own circuit similarly affirmed the Eastern District's striking of a day laborer solicitation ordinance where the defendant municipality possessed "a number of less burdensome alternatives to address street and sidewalk safety," such as prohibitions against pedestrians entering traffic, driving at a slow speed that impedes traffic, parking unlawfully, and jaywalking.  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 117 (2d Cir. 2017) (citing *Centro De La Comunidad*

*Hispana De Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 619 (E.D.N.Y. 2015) (collecting statutes)). *See also Cutting v. City of Portland*, 802 F.3d 79, 91-92 (1st Cir. 2015) (striking an anti-solicitation ordinance affecting sidewalks and medians for failure to use "existing state and local laws that prohibit disruptive activity in roadways).

The reasoning of *McCullen*, *Valle del Sol*, *Comite de Jornaleros*, *Centro de la Comunidad*, and *Cutting* requires the same conclusion here. Connecticut law already provides myriad tools to guard against poor driving in response to seeing core political speech on a sign. Among other things, the state's vehicle code provides ample civil and criminal guardrails against driver misbehavior. *See* Conn. Gen. Stat. § 14-220(a) (forbidding driving on highway "at such a slow speed as to impede or block the normal and reasonable movement of traffic"); *id*. § 14-240(b) (following "more closely than is reasonable and prudent"); *id*. § 14-240a(a) (following too closely "with the intent to harass or intimidate"); *id*. § 14-236 (requiring drivers on multi-lane roads to stay as "nearly as practicable entirely within a single lane," and barring lane-changes before "the driver has ascertained that such movement can be made with safety"); *id*. § 14-232(a) (controlling passing on the left); *id*. § 14-233 (controlling passing on the right); *id*. § 14-218a(a) (catch-all traveling at speed "greater than is reasonable" for conditions); *id*. § 14-219(a) (speeding); *id*. § 14-122(a) (reckless driving); *id*. § 14-222a (causing the death of another "in consequence of the negligent operation of a motor vehicle"); *id*. § 14-296aa(b) (barring use of hand-held mobile devices while driving).

Connecticut's civil and criminal traffic code provisions, its "generic criminal statutes," and its common law of torts all provide ample means to deter and control the harms Defendant Higgins here seeks to control by silencing speech. *McCullen*, 573 U.S.

at 492.  A total overpass speech ban is therefore not narrowly tailored to combat distracted driving.

### 3.2.3.    A total overpass speech ban is unconstitutional for failing to leave open ample alternate channels of communication.

Finally, even content-neutral speech restrictions that *are* narrowly tailored—and a complete overpass speech ban is not—must be stricken if they do not provide ample alternative channels of communication.  *E.g.*, *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  The key yardstick is the identity of the audience in the substitute time, place, or manner.  *Corsones*, 131 F.4th at 73.  No meaningful alternative exists in moving a speaker from the front of the state capitol, for example, to a place across town on the theory that *someone* will hear the speech wherever it occurs.

So, for example, the union wishing to leaflet Lincoln Center patrons has sufficient alternative channels "where neighboring . . . [p]arks, and the public sidewalks surrounding Lincoln Center" are open.  *Hotel Emps. & Rest. Emps. Union v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 556 (2d Cir. 2002).  And the speakers wishing to address attendees of a national political convention at Madison Square Garden have alternative channels to do so from a designated demonstration space one block from the Garden where "there are many ways to arrive at the Garden," and "[m]any" of the speakers' intended audience—delegates to a national political convention—"may have traveled to the Garden by a route that brought them close to the [designated] demonstration zone."  *Marcavage v. City of New York*, 689 F.3d 98, 108 (2d Cir. 2012).

But here, Connecticut exercises complete control over anything that may be viewed within 660 feet of Connecticut's interstates.  Conn. Gen. Stat. § 13a-123.  Interstates are limited access highways from which Ms. Quinn and Dr. Marra are forbidden to enter as pedestrians, so they cannot walk alongside the interstates displaying their signs.  Defendant Higgins's speech ban thus functionally prevents them from speaking to their intended audience at all.

It is no answer that Dr. Marra and Ms. Quinn may try purchasing space on one of the close-to-the-interstate billboards that DOT regulations allow.  Billboard space is expensive, running around $1600 per month on the low end.[28]  And, it is not just Ms. Quinn's and Dr. Marra's for the asking.  Space may not be available because advertisers have booked up the space months (or even years) in advance.  *See Bery v. New York City*, 97 F.3d 689, 698 (2d Cir. 1996) (striking municipal art sale permitting scheme in part based on lack of alternate channel for display of artwork, reasoning that the existence of private galleries was insufficient even if plaintiffs "could get their works accepted for showing").

In the unique context of Connecticut's interstates, where both signage and pedestrian access are completely regulated, the government exercises plenary control over the visual transmission of information within its boundaries except for overpass sidewalks.  Barring speech on those sidewalks leaves no alternative means by which the plaintiffs may reach interstate drivers, and therefore violates the Speech Clause.

---

[28] Barrett Decl. ¶ e.

**3.3.   The sidewalk speech ban forces Ms. Quinn and Dr. Marra to choose between speaking and being criminally prosecuted, thus creating irreparable harm.**

A plaintiff whose claim involves the alleged deprivation of a constitutional right—particularly a First Amendment one—is presumed to have established irreparable harm, *e.g.*, *New York Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Since January, the state police have adhered to a practice of interrupting sidewalk speech—including the plaintiffs'—by various means including temporary detention, arrest, and prosecution.  Dr. Marra and Ms. Quinn have been present for such interruptions, and are also aware that some of their fellow protesters engaged in identical speech have been arrested and prosecuted.  Their claims are ripe for adjudication, *e.g.*, *Mahmoud v. Taylor*, 606 U.S. 522, 559-60 (2025), and their choice between a loss of liberty and the loss of speech merits an injunction.  *Reyes v. New York City*, 141 F.4th 55, 68 (2d Cir. 2025).

**3.4.   Preserving Ms. Quinn and Dr. Marra's right to speak is a paramount public interest, as an order doing so would enforce government obedience to the Constitution.**

In the typical litigation, a preliminary injunction-seeker bears the burden of showing that the balance of equities in issuing the injunction tips towards them and that issuance of the injunction lies in the public interest.  *E.g.*, *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).  But in litigation attempting to force the government to abide by the law, those two inquiries merge.  *E.g.*, *New York v. DHS*, 969 F.3d at 58-59. Ms. Quinn and Dr. Marra easily clear the unified inquiry.

"A preliminary injunction is in the public interest if [it] would not cause harm to the public interest." *S.E.C. v. Citigroup Global Markets*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (cleaned up).  The public, of course, has a paramount interest in "ensuring that the government complies with its obligations under the law and follows its own procedures," *Medina v. Dep't of Homeland Security*, 313 F. Supp. 3d 1237, 1252 (W.D. Wash. 2018), which is to say that paradigmatic public interest is ensuring that the government abides by the law.  And so, "a general requirement to follow the law does not impose a hardship" on the government.  *Disability Rts. N.Y. v. New York State Dep't of Corr. & Community Supervision*, No. 21-cv-739, 2022 WL 484368, at *13 (N.D.N.Y. Feb. 17, 2022).  *Accord, e.g., Volokh v. James*, 656 F. Supp. 3d 431, 447 (S.D.N.Y. 2023) (inquiry satisfied in free speech dispute where "enjoining enforcement of a statute that potentially violates citizens' constitutional rights is in the public interest, and that Defendant[s] can show no harm as a result of being prevented from enforcing an unconstitutional statute").

### 3.5. Because Ms. Quinn and Dr. Marra seek to vindicate their constitutional rights, they should not be made to post an injunction bond.

Rule 65 (c) provides, in part, that a party granted a preliminary injunction must give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Yet federal courts routinely waive the security requirement where litigation challenges the infringement of a constitutional right.  *See, e.g., Pharmaceutical Soc'y of N.Y. v. N.Y. Dep't of Soc. Servs.*, 50 F.3d 1168, 1175 (2d Cir. 1995) (affirming waiver where case was "pursued to enforce public interests"); *Greenwich Bd. of Educ. v. Torok*, No. 03-cv-

1407, 2003 WL 22429016, at *3 n.7 (D. Conn. Oct. 22, 2003) (waiving bond where the requirement could "discourage children and their parents from enforcing their federal rights"). Here, Dr. Marra and Ms. Quinn seek preliminary injunctive relief to avoid significant infringement on their First Amendment rights. The Court should therefore waive the security requirement in keeping with its ample discretion under Fed. R. Civ. P. 65.

**4.    Conclusion**

For the above reasons, the Court must grant Dr. Marra and Ms. Quinn a preliminary injunction barring the state police from silencing their speech when they speak from overpasses that are themselves not limited-access highways.

\_\_\_/s/ Dan Barrett\_\_\_
Dan Barrett
Elana Bildner
Jaclyn Blickley
ACLU Foundation of Connecticut
P.O. Box # 320647
Hartford, CT 06132
(860) 471-8471
e-filings@acluct.org
