# Exhibit 1

**(Excerpts of Deposition of Plaintiff Robert Marra – Jan. 27, 2026)**

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF CONNECTICUT

3     _____

4     ERIN QUINN, et al.,              CIVIL ACTION NO.

5                                      3:25-CV-1548(SRU)

6          Plaintiffs,

7     v.

8     GARRETT EUCALITTO, et al.,

9          Defendant.

10    _____

11                 Deposition of

12                 ROBERT MARRA

13    DATE:        JANUARY 27, 2026

14    TIMES:       12:08 P.M.

15    LOCATION:

16                 OFFICE OF THE ATTORNEY GENERAL

17                 165 CAPITOL AVENUE

18                 HARTFORD, CONNECTICUT

19

20

21

22

23

24

25

PX
16

1                    APPEARANCE

2

3   On behalf of the Plaintiffs:

4            Elana Bildner, Esquire

5            American Civil Liberties Union

6            P.O. Box 320647

             Hartford, Connecticut 06132

7

             Telephone:  (860)471-8475

8            ebilder@acluct.org

9

10  On behalf of the Defendants:

11           Owen R. Eagan, Esquire

12           Terrance M. O'Neill, Esquire

             Assistant Attorney General

13

             Office of the Attorney General

14           165 Capitol Avenue

15           Hartford, Connecticut 06106

             Telephone:  (860)808-5450

16

             Facsimile:  (860)808-5591

17           Owen.Eagan@ct.gov

18

19

20  On behalf of the ACLU Foundation of Connecticut:

21

22       Grace Sinnott, Paralegal

         Dan Barrett, Esquire

23

         Jaclyn Blickley, Esquire

24       Joe Gaylin, Esquire

25

1                    I N D E X
2   Appearances                                    2
3   Stipulations                                   4
4   Proceedings begin                              5
5        WITNESS:  Robert Marra
6   Direct Examination by Mr. Eagan                15
7   Cross Examination by Ms. Bildner               86
8   Reporter's Certificate                         91
9
10
11
12                  E X H I B I T S
13
14  Exhibit 1   Declaration of Robert Marra        48
15
16
17
18  [REPORTER'S NOTE:  Exhibits were retained by Mr. Eagan]
19
20
21
22
23
24
25

```
1                    S T I P U L A T I O N S

2

3       IT IS HEREBY STIPULATED AND AGREED by and between

4    counsel representing the parties that each party reserves

5    the right to make specific objections at the trial of the

6    case to each and every question asked and of the answers

7    given thereto by the deponent, reserving the right to move

8    to strike out where applicable, except as to such

9    objections as are directed to the form of the question.

10

11      IT IS FURTHER STIPULATED AND AGREED by and between

12   counsel representing the respective parties that proof of

13   the official authority of the Notary Public before whom

14   this deposition is waived.

15

16      IT IS FURTHER STIPULATED AND AGREED by and between

17   counsel representing the respective parties that all

18   defects, if any, as to the notice of the taking of the

19   deposition is waived.

20

21      IT IS STIPULATED AND AGREED that the reading and

22   signing of the deposition by the deponent is not waived.

23

24      Filing of the Notice of Deposition with the original

25   transcript is waived.
```

```
1                 P R O C E E D I N G S
2              (On the record 12:08 p.m.)
3          COURT REPORTER:  Counsel, usual stipulations?
4          MS. BILDNER:  Same as previous, thank you.
5          MR. EAGAN:  That is agreeable.  Thank you.
6          MS. BILDNER:  And the witness will read and
7      sign, just to be super clear.
8          COURT REPORTER:  Oh, he will read and sign?
9          MS. BILDNER:  Yes.
10         COURT REPORTER:  Okay.  Do you want the previous
11     witness to read and sign as well?
12         MS. BILDNER:  Yes.
13         COURT REPORTER:  Thank you.
14         MS. BILDNER:  Thank you.
15         (Witness placed under oath.)
16         COURT REPORTER:  Thank you.  Counsel, your on
17     the record at 12:08.
18         MR. EAGAN:  Thank you.  Thank you for being
19     here, Mr. Marra.  So we are on the record.  To be
20     clear, everything that we're going to say here,
21     unless it's otherwise indicated, will be on the
22     record for the court.  Is that clear?
23         MR. MARRA:  Yes, it is.
24         MR. EAGAN:  Thank you.  This is the case of
25     Quinn, et al., versus Eucalitto, et al.  It's in the
```

1    A    Not knowing the sum of all the behavior of all

2    highway state troopers, I wouldn't be able to make that

3    kind of a calculation.

4    Q    Did you do any research that contributed to your

5    decision not to participate in further overpass protests?

6    A    No.

7    Q    Do you think there is a highway overpass speech

8    ban in effect in Connecticut?

9    A    No.

10    Q    In your preparations for this deposition today,

11    did you review the CV of Commissioner Ronnell Higgins, one

12    of the defendants?

13    A    I didn't.

14    Q    Would it surprise you to know that Commissioner

15    Higgins was formerly the head of, essentially, the Yale

16    University Police Department?

17    A    It would not.

18    Q    Would it surprise you to know that Commissioner

19    Higgins, in his leadership role, the security leadership

20    role at Yale, managed -- Withdrawn.  Would it surprise you

21    to know that Commissioner Higgins, in his security role at

22    Yale, has considerable experienced with protest

23    activities?

24    A    Would not.

25    Q    Have you ever met Commissioner Higgins before?

1    Q    Turning to page 3 of 5 in Document 12, your
2    declaration.  I will turn to paragraph 17.  I'll read it.
3    When they see our signs and see us waving, people
4    sometimes honk and wave back.  Sometimes they give us the
5    middle finger or yell things.  But interacting with them
6    makes the protest better than just putting up a yard sign
7    or attending a rally consisting entirely or nearly of
8    like-minded people.  People can see that we are people who
9    live in this area who care enough about our country to
10   take the time to try connecting with others and change
11   minds.  So do you see that, paragraph 17?
12   A    I read it along with you.
13   Q    So when a driver is honking or giving a crude
14   gesture or yelling, would you say they are engaging with
15   the demonstration?
16   A    No.
17   Q    When a driver is doing those things, can they be
18   fully concentrated on driving?
19   A    Probably not.
20   Q    Moving on to paragraph number 18.  I live in
21   southern Connecticut, and I-95 is an important place to
22   connect with people.  It's kind of the Main Street of New
23   Haven and Fairfield Counties.  Can you please explain what
24   you mean by that?
25   A    I would strike it now, reading it and finding it

1    to be a little bit too cute by half.  So the idea just

2    being that people spend a lot of time on I-95, and I think

3    that, that would have probably been a more reasonable way

4    to phrase this, looking back.

5        Q    Okay.  So the idea of connection on a highway,

6    upon reflection, think that a highway is not -- Withdrawn.

7    Would you reconsider your statement that I-95, quote --

8    Withdrawn.  Would you reconsider your statement that I-95

9    is an important place to connect with people?

10       A    I forget.  What did you ask me?  I'm sorry.

11       Q    Okay, I'll re-frame it.

12       A    I just can't remember.  I don't remember if you

13   asked me to agree with it or disagree with it.

14       Q    No problem.  You have stated, quote, I-95 is an

15   important place to connect with people.  Do you still

16   agree with that statement?

17       A    Yes.

18       Q    Okay.  Can you explain it?

19       A    There are a lot of people driving on the

20   interstate, being asked to engage with many signs.  I

21   can't say for sure, but I doubt that all of them would

22   show up at a rally.  And based on the numbers that we see

23   on the green, they probably aren't all showing up at

24   rallies.  And so this is a way to get a message to people

25   while they're driving and listening to radio or whatever

1    else they're doing, to also see a message such as the type

2    that we are showing.

3         Q    Okay.  So you said before that your statement in

4    this paragraph was too cute by half.  What did you mean by

5    that?

6         A    The Main Street part.

7         Q    Can you explain that?

8         A    Well, Main Street is different.  It's not going

9    to have three lanes of traffic.  It is not meant to get

10   people quickly from one place to another.  People are

11   dealing with traffic lights and pedestrians, shops,

12   parking, those kinds of things.  So it's a different kind

13   of driving experience, as I think anybody who drives would

14   probably agree.  I think it's a reasonable statement to

15   make.

16        Q    Moving on.  Paragraph number 19.  This paragraph

17   reads, There is nothing like I-95 for volume.  When we

18   display our signs there and wave we can reach many more

19   people than we could on a local road.  This statement that

20   there is nothing like I-95 for volume, is that what you

21   meant when you said that it's an important place to

22   connect with people?

23        A    Yeah.

24        Q    Okay.  So in other words, I-95 presents an

25   audience for the Visibility Brigades demonstrations, in

1    your view; is that right?

2         A     Yeah, I think that's a good way to put it.

3         Q     Next paragraph.  Paragraph number 20 reads, from

4    decades of living in southern Connecticut and traveling on

5    I-95, it has been my experience that the interstate is

6    almost always heavily trafficked.  Do you still agree with

7    that statement?

8         A     I do.

9         Q     What types of vehicles typically sit in the

10   traffic that you see on I-95?

11        A     Types -- anything from passenger vehicles of

12   different sizes, and I suppose one might see a bus now and

13   then.  Large eighteen-wheelers, large trucks.

14        Q     I see.  When you say a bus, does that include

15   passenger buses?

16        A     I suppose.  I don't recall seeing very many of

17   them, but sure.

18        Q     When you say a bus, could that include a school

19   bus?

20        A     I've never -- I don't think I've ever seen a

21   school bus on the interstate.  I'm not saying they don't

22   go, I just rarely see school buses on the interstate.

23        Q     Noted.  Is it fair to say that Visibility

24   Brigade demonstrations that you attended were often timed

25   to match either the morning or evening rush hour?

1    there other demonstrators with you there on Stephens

2    Avenue that day in July?

3         A    Yeah.

4         Q    Did they seem comfortable with the reasons given

5    by the state troopers?

6         A    I don't know about -- I can't remember how many

7    people.  It seemed everybody felt like, gosh, at least

8    these guys were courteous.  The West Haven police have

9    always been, at least in my experience, courteous, and I

10   like the West Haven police for the most part.  When they

11   happen to go down the neighborhood and say anything,

12   "Everything okay?" I like having law enforcement.  And I

13   think that when they left, we just said, if only all of

14   our interactions could be like that.  But my feeling was

15   that, yeah, but we still don't have a clear idea of what's

16   okay and what's not okay.  That's -- you know, I'm not the

17   same as everybody else, and everybody else isn't the same

18   as me.  Yes.

19            MS. BILDNER:  Okay.  Thank you.  That's all I

20        wanted to ask.

21            MR. EAGAN:  That concludes our deposition, then,

22        seeing that, you know, we confirmed it between

23        counsel.  Thanks to all.  And we can go off the

24        record.

25            (Proceedings concluded 3:16 p.m.)

1                    REPORTER'S CERTIFICATE

2

3          I, Rachel Murphy, COURT REPORTER, the officer

4    before whom the foregoing proceedings were taken, do

5    hereby certify that the foregoing transcript is a true and

6    accurate record of the testimony given; that said

7    testimony was taken by me and thereafter reduced to

8    typewriting under my direction; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12

13   IN WITNESS WHEREOF, I have here unto set my hand and

14   affixed my Notary seal this 29th day of January, 2026.

15

16

17

18   RACHEL A. MURPHY - NOTARY PUBLIC

19   IN AND FOR THE STATE OF CONNECTICUT

20   MY COMMISSION EXPIRES:  APRIL 30, 2029

21

22

23

24

25

1                    **ERRATA SHEET**

2                  **CHANGES IN TESTIMONY**

3       **ERIN QUINN, et al.,  vs. GARRETT EUCALITTO, et al.**

4                     **ROBERT MARRA**

5    **PAGE   LINE       FROM                    TO**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21  **SIGNATURE OF WITNESS:**_____

22  **DATE:**_____

23

24

25

1          **JURAT**

2

3    I,                    do hereby certify that the foregoing

4    testimony given by me on                is true and

5    accurate, including any corrections noted on the

6    corrections page, to the best of my knowledge and belief.

7

8    _____

9        (Deponent signature)

10

11      At                    in the said County of

12                 , this          day of          20,

13   Personally appeared                    , and he/she made

14   oath to the truth of the foregoing answers by his/her

15   subscribed.

16

17   Before me,

18   Notary Public

19   My commission expires

20

21

22

23

24

25

1    INSTRUCTIONS FOR READING AND SIGNING OF

2    DEPOSITION TRANSCRIPT UNDER OATH

3

4    1.  Please read the enclosed transcript of your testimony.

5

6    2.  If there are any corrections to be made to the

7    transcript, please use the attached form for any and all

8    corrections.

9

10   3.  After reading the transcript, appear before a notary

11   public and sign before him/her.

12

13   4.  Please complete this review within 30 days of the

14   receipt of the transcript as allowed by stature.

15

16   5.  IMPORTANT:  Upon proper signing by a notary public and

17   yourself, RETURN ERRATA AND JURAT SHEETS TO ALL COUNSEL OF

18   RECORD.

19

20   6.  If there are no corrections to be made to the

21   transcript, the transcript stands as is and will be filed

22   with the court with no changes necessary.

23

24   7.  If you have any questions regarding this procedure,

25   please contact your attorney or our office.